763 A.2d 1233

**Linda McCOY, et al.**

v.

**Billie HATMAKER, et al.**

No. 2936, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Dec. 26, 2000.

694

Michael J. Winkelman (McCarthy & Costello, L.L.P., on the brief), Lanham, for appellants.

Edward W. Brady (Timothy L. Mullin, Jr., Alicia C. Reynolds, Miles & Stockbridge, P.C. and Michael G. Raimondi, on the brief), Baltimore, for appellant Hatmaker.

William R. Phelan, Jr., Prinicipal Counsel, Baltimore, for appellee, Schwaab.

Argued before HOLLANDER, THIEME * and KRAUSER, JJ.

THIEME, Judge.

This is an appeal from summary judgment granted to appellees in a wrongful death claim and survival action. Appellant Linda McCoy, individually and as personal representative of the estate of William McCoy, filed a complaint on January 10, 1999, in the Circuit Court for Baltimore City against two Baltimore City employees, paramedic Billie R. Hatmaker and police officer Brian Schwaab; the Baltimore City Police Department;[1] and the Mayor and City Council of Baltimore City.

Hatmaker and Officer Schwaab filed separate motions for summary judgment, and the court heard these motions and McCoy's opposition to them on January 14, 2000. The City filed a line adopting Hatmaker's pleadings on the same day, although its separate summary judgment motion was not before the court at that time. The court granted Hatmaker's and Schwaab's motions at the hearing, and it later granted Baltimore City's motion for summary judgment on February 10, 2000. This appeal followed, and McCoy now asks:

---

* Thieme, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. The court granted the Baltimore City Police Department's motion to dismiss on July 8, 1999. The department is no longer a party to this case.

1. Did the court below err in considering and granting appellees' motions for summary judgment on the basis that appellant failed to make a prima facie showing of gross negligence on the part of appellees Hatmaker and Schwaab, even assuming the truth of all allegations against them?

2. Did the court below abuse its discretion by striking an affidavit of appellant's expert witness contradicting that witness's deposition testimony, because it included testimony that amounted to a legal conclusion and because appellant submitted it beyond the discovery deadline?

3. Did the court below abuse its discretion when it quashed the subpoena for the deposition of a supervising Lieutenant who investigated the incident and entered a protective order barring, as privileged, discovery of his report?

To these questions, we answer "no" and explain.

### Facts

On the evening of January 24, 1996, William McCoy, age 62, was driving himself and a co-worker, Bernard Lowe, to their place of employment. McCoy typically picked up Lowe at about 10:00 p.m. so that the two would arrive in time for their 11:00 p.m. shift.

McCoy, heading north on Hanover Street in Baltimore City, stopped for a red light. As the two men conversed, Lowe recalls, the following took place:

I said something to Bill, and Bill never answered me. I said, "You didn't see that Bill?" I turned around and looked, and I thought Bill dropped his cigarette between his legs because his head was down and his hand was in his lap, and I thought he dropped his cigarette. I'm like, "Hey Bill," and there was no response, no nothing.

The next I know we're going off into the parked cars. I reached over and grabbed the steering wheel. I'm still yelling at him and I grabbed the steering wheel and got it

straight back out on the street to keep us from hitting the parked cars. That's how it happened.

Lowe then engaged the emergency brake. When the car had come to a stop, Lowe explains, McCoy was still in the driver's seat, non-responsive to Lowe's efforts to rouse him and making what Lowe described as gargling noises. Lowe left the car and flagged down a passing police car, driven by Officer Irvin Bradley.

He asked me what was going on. I told him something is wrong with my buddy. I said, "All he's doing is gargling. I thought he dropped his cigarette." He heard me yelling, "Bill, Bill," and he walked over, put his hand in the throat area by his ear and stuff I guess to check for a pulse, and he said something.

Officer Bradley told Lowe that McCoy had a "small pulse," then called for assistance on his shoulder radio.

After Officer Bradley called for assistance, Officer Brian Schwaab arrived at the scene. Officer Schwaab is a trained emergency medical services provider who is qualified both as a first responder and an emergency medical technician ("EMT"). At the time, he had been about eight blocks away, patrolling the lower area of the southern district. Responding to Officer Bradley's call for assistance, he estimated that he arrived at the scene within "a minute" of hearing the call. He brought with him a personal resuscitation mask.

Officer Schwaab immediately asked Officer Bradley what had occurred. He also went over to McCoy, ensured that his airway was open, and checked for a pulse. He did not feel one. Before he could start cardiopulmonary resuscitation ("CPR"), however, Officer Schwaab noticed an ambulance, Medic 5, rounding the corner to turn southbound on Hanover Street.

Although appellant now seeks to infer otherwise, the undisputed evidence, including City records and staff testimony, shows that Medic 5 reached the scene only on its second attempt. Medic 5 was initially dispatched at 10:21 p.m. Because of confusion relating to the exact location of McCoy's

vehicle, the ambulance initially went to the wrong address. The same rig was then dispatched a second time-in fact, Paramedic Hatmaker, who was with the ambulance, even recorded a new call on the run sheet—at 10:25 p.m., and it reached the scene at about 10:30 p.m. Officer Schwaab greeted the ambulance crew with the news that McCoy was in full cardiac arrest.

Paramedic Hatmaker ran to McCoy's car and assessed his condition. He noted that McCoy, who was slumped over the steering wheel, showed no visible signs of life. He felt no pulse in McCoy's carotid artery. Placing his stethoscope under McCoy's sweatshirt, Hatmaker listened for a heartbeat and heard none.[2] Heart sounds, in fact, were entirely absent. Hatmaker next examined McCoy's eyes by opening his eyelids and examining his pupils with a penlight. He observed McCoy's pupils to be fixed and dilated and his sclera dry. He then checked McCoy's body for signs of trauma, including blood, and found none. Finally, Hatmaker observed that McCoy had already released body fluids and his body temperature had already dropped markedly. He thus concluded that McCoy was dead and was not a viable candidate for resuscitation.

Because he considered his job there over, Hatmaker proceeded to complete a Maryland Ambulance Information Sheet regarding the call, then conferred with police, who would summon the Medical Examiner to remove McCoy's body from the car and transport it to the morgue.

In her complaint, appellant alleged that Hatmaker breached his duty of care to McCoy by "failing to render appropriate resuscitation and emergency medical treatment" and "violating the Maryland State Protocols for Cardiac Rescue Techni-

---

2. Appellant alleges that Hatmaker applied the stethoscope on top of McCoy's sweatshirt; however, no evidence exists to support her assertion. In fact, neither Lowe nor Officer Schwaab was present when Hatmaker examined McCoy. Indeed, Lowe testified that he walked away from the car, and both men aver that they were in a home across the street using the telephone of the resident while Hatmaker examined McCoy.

cian and Emergency Medical Technician/Paramedic Guidelines for deceased cases" (hereinafter the "Maryland Institute for Emergency Medical Services Systems protocols" or the "MIEMSS protocols"). Appellant asserted that, by committing such a breach, Hatmaker was grossly negligent.

All of appellant's experts were deposed during discovery, including her emergency medical services expert Gerald M. Dworkin, who testified at a deposition on October 20, 1999.

Additionally, on October 15, 1999, appellant noted the deposition of Lieutenant William J. Shelley of the Baltimore City Fire Department. Lt. Shelley had investigated the incident on behalf of the Fire Department's Medical Bureau and had concluded, in his report to the Fire Department chain of command, that Hatmaker had violated some MIEMSS protocols when he treated McCoy.[3] The report was placed in Hatmaker's personnel file. On November 9, the Baltimore City Police Department moved to quash appellant's subpoena *duces tecum* and prevent discovery of the report, on grounds that such information was confidential and thus not subject to discovery.

Appellant opposed appellees' motion. On December 15, the court granted that motion, quashed the subpoena for Lt. Shelley's deposition, and entered an order precluding formal discovery of any findings or records of the Fire Department's review of Hatmaker's performance in the McCoy incident. For reasons that are not clear, we note that appellant already possessed a copy of the report in question. The court's order, however, effectively precluded her from using the report.

On December 2, Hatmaker and Officer Schwaab moved for summary judgment, and the City adopted Hatmaker's pleading by line. Appellees argued that, because neither had committed any willful act nor any grossly negligent act or omission under the standard set forth in *Tatum v. Gigliotti*, 80 Md.App. 559, 565 A.2d 354 (1989), *aff'd*, 321 Md. 623, 583 A.2d

---

**3.** Lt. Shelley had prepared this report in response to a request from McCoy's son.

1062 (1991), they were immune from suit under both the Good Samaritan Act, Md.Code (1973, 1998 Repl.Vol.), § 5–603 of the Courts & Judicial Proceedings Article,[4] and the Fire and Rescue Company Act, Md.Code (1973, 1998 Repl.Vol.), § 5–604 of the Courts & Judicial Proceedings Article.[5]

Appellant opposed the motion, submitting with her opposition an affidavit from Dworkin, in which he opined,

---

**4.** The Good Samaritan Act states in relevant part:
(a) A person described in subsection (b) of this section is not civilly liable for any act or omission in giving any assistance or medical care, if:
(1) The act or omission is not one of gross negligence;
(2) The assistance or medical care is provided without fee or other compensation; and
(3) The assistance or medical care is provided:
(i) At the scene of an emergency;
(ii) In transit to a medical facility; or
(iii) Through communications with personnel providing emergency assistance.
(b) Subsection (a) of this section applies to the following:
(1) An individual who is licensed by this State to provide medical care;
(2) A member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad or law enforcement agency or of the National Ski Patrol System, or a corporate fire department responding to a call outside of its corporate premises, if the member:
(i) Has completed an American Red Cross course in advanced first aid and has a current card showing that status;
(ii) Has completed an equivalent of an American Red Cross course in advanced first aid, as determined by the Secretary of Health and Mental Hygiene; or
(iii) Is certified or licensed by this State as an emergency medical services provider;
(3) A volunteer fire department, ambulance and rescue squad whose members have immunity; and
(4) A corporation when its fire department personnel are immune under paragraph (2) of this subsection.
§ 5–603(a) & (b).

**5.** The Fire and Rescue Company Act states in relevant part:
Notwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.
§ 5–604(a).

to a reasonable degree of certainty in the field of emergency medical services, the acts and/or omissions of Defendant Hatmaker and Defendant Schwaab constituted not only a breach in the standard of care by falling well below the recognized standards, but that these acts and/or omissions also constituted a reckless disregard for the life of William McCoy and resulted in his death.

The court granted appellees' motion for summary judgment after a hearing on January 14, 2000. At that hearing, Hatmaker moved to strike Dworkin's affidavit on grounds that i) the affidavit could not act to defeat summary judgment under *Pittman v. Atlantic Realty Co.*, 127 Md.App. 255, 732 A.2d 912 (1999), *rev'd*, 359 Md. 513, 754 A.2d 1030 (2000), and ii) Dworkin's affidavit was inadmissible because it stated a conclusion of law. The Court granted this oral motion and also granted Hatmaker's and Officer Schwaab's summary judgment motions at the hearing. On February 10, the court additionally granted Baltimore City's motion for summary judgment. This appeal followed.

### Discussion

We review grants of summary judgment *de novo* under a simple standard: whether the trial court's legal conclusions were correct. *See Matthews v. Howell*, 359 Md. 152, 161–62, 753 A.2d 69 (2000); *Green v. H. & R. Block, Inc.*, 355 Md. 488, 502, 735 A.2d 1039 (1999); *Calomiris v. Woods*, 353 Md. 425, 434, 727 A.2d 358 (1999); *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 204, 680 A.2d 1067 (1996). Here, the grant of summary judgment rests in part on the court's exclusion of expert witness Dworkin's eleventh-hour affidavit, which concludes that appellees had been grossly negligent. Without that affidavit, appellant cannot aver any genuine issue of material fact—any factual controversy that would somehow affect the outcome of this case, *see Goodwich*, 343 Md. at 206, 680 A.2d 1067 (citing *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985))—that shows Hatmaker and Officer Schwaab committed any willful or grossly negligent act. Appellant otherwise concedes that the immunity provisions of sections 5–

603 and –604 apply. Although the Court of Appeals, when it reversed *Pittman,* dealt a blow to the trial court's reasoning relying on that case, we hold that the blow was not fatal, for the court's secondary justification gave it sufficient rationale for striking the affidavit. Likewise, we hold that the trial court committed no abuse of discretion when it quashed appellant's subpoena *duces tecum* for the deposition testimony of Lt. Shelley and the report he prepared. We address each issue in turn.

## I

The trial court granted summary judgment in favor of appellees because Maryland law affords them immunity from civil damages in the absence of gross negligence or willful misconduct. Finding that appellant presented no evidence of such abuses, the trial court properly ended this action.

Under Maryland law, two separate statutes immunize fire, rescue, and law enforcement personnel from civil damages for errors and omissions made while acting in the scope of their duties. The Good Samaritan Act grants a broad class of rescuers, which would include both Hatmaker and Schwaab (because he is a trained EMT), and medical providers civil immunity "for any act or omission in giving any assistance or medical care," in the absence of gross negligence, where they provide care without fee or compensation i) at the scene of an emergency, ii) during transit to a medical facility, or iii) through communication with personnel providing such assistance. § 5–603. The Fire and Rescue Company Act further ensures that members of fire and rescue companies, like Hatmaker, "are immune from civil liability for any act or omission in the course of performing their duties," except for those acts that are willful or grossly negligent. § 5–604(a). Appellant concedes, in fact, that the proper standard for determining appellees' liability is one of gross negligence.

## A

*Tatum v. Gigliotti* fleshes out Maryland's gross negligence standard in the context of services provided by emer-

gency medical technicians such as Hatmaker operating within their assigned duties:

"Gross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or for the rights of others.' "

*Tatum,* 80 Md.App. at 568, 565 A.2d 354 (quoting *Foor v. Juvenile Serv.,* 78 Md.App. 151, 170, 552 A.2d 947 (1989)). One is grossly negligent or acts wantonly and willfully " 'only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.' " *Tatum,* 80 Md.App. at 568, 565 A.2d 354 (quoting *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968)). Stated differently, only extraordinary or outrageous conduct can be termed gross negligence-mere "reckless[ness] is not enough; there must be reckless disregard for human life." *Khawaja v. Mayor & City Council,* 89 Md.App. 314, 319, 598 A.2d 489 (1991) (citing *Nast v. Lockett,* 312 Md. 343, 352, 539 A.2d 1113 (1988)), *appeal dismissed,* 326 Md. 501, 606 A.2d 224 (1992).

In *Tatum,* an asthma sufferer in the midst of a severe attack called the Prince George's County Fire Department and requested emergency aid. Paramedics, including defendant Gigliotti, arrived and sought to have plaintiff's decedent employ an emergency treatment commonly used for hyperventilation (but not for asthma). When he resisted this effort, they administered oxygen and then escorted him to the ambulance, requiring him to walk. En route to the hospital, plaintiff's decedent further resisted the paramedics' efforts to administer oxygen and refused to lie on the stretcher. When the ambulance rounded a sharp turn at the entrance of the hospital, the decedent fell to its floor. At the emergency room door, paramedics placed the decedent on a gurney and turned him over to hospital personnel. *Tatum,* 80 Md.App. at 562–63, 565 A.2d 354.

In the ambulance report, paramedics stated that the decedent "was conscious, stable, pupils normal, and pupils were equal." *Id.* In fact, emergency room personnel testified that

the decedent was "in complete respiratory and cardiac arrest" when admitted. *Id.* A physician performing the post-mortem examination testified that plaintiff's decedent died from cerebral edema, secondary to anoxia from status asthmaticus with respiratory arrest. *Id.* When asked whether the administration of oxygen in the ambulance would have saved decedent's life, the physician testified in the affirmative. *Id.*

Despite such highly egregious facts showing misdiagnosis of the patient, treatment bordering upon cruelty, and falsification of official records, we nevertheless upheld the trial court's grant of summary judgment in favor of Gigliotti:

> Even though the lower court, in ruling on the question of sufficiency of the evidence, is required to take the facts in the light most favorable to the plaintiff, we hold that the trial judge acted properly in granting the appellee's motion for judgment. The evidence in this case indicated that although the actions of Gigliotti may have amounted to negligence, they do not satisfy the threshold of gross negligence.

*Id.* at 569, 565 A.2d 354. We went on to explain how the plaintiff's own expert, although he initially condemned the actions of the paramedics as "reckless," backed away from this description during cross-examination, stating, "I believe it is an improper action that could have aggravated the condition." *Id.* After being instructed by the court on the correct standard for gross negligence, the expert refused to testify that Gigliotti's actions constituted reckless disregard for the decedent's life. *Id.* We thus held that, as a matter of law, Gigliotti was insulated from liability by the Good Samaritan Act.

Here, appellant asserts that Hatmaker "breached [his duty] of care by [failing] to render appropriate resuscitation and emergency medical treatment; by [abandoning] treatment of Mr. McCoy without the direction of a medical doctor; and by [failing] to appropriately examine [*sic*] the plaintiff to determine his status and survivability prior to abandoning his efforts." She then posits that each of these alleged breaches constitutes gross negligence and argues that, in concluding

otherwise, the court below engaged in improper fact-finding. *See, e.g., DiGrazia v. County Executive,* 288 Md. 437, 445, 418 A.2d 1191 (1980) (purpose of summary judgment is not to settle factual disputes but rather to determine existence of a genuine issue of material fact that would provide the basis for trial).

 From our perspective, however, the court below did nothing more than apply the legal standard in *Tatum* to the undisputed facts and, even resolving all inferences in appellant's favor, found that her insubstantial allegations failed to withstand the most basic level of scrutiny provided by the summary procedure. No party disputes that when Hatmaker arrived on the scene he ran from the ambulance to McCoy's vehicle and began to assess his condition with the intention of saving his life. Using his stethoscope on McCoy's chest, he tried to establish a heartbeat. He likewise checked McCoy's carotid artery for a pulse. He assessed McCoy's eyes and found his pupils to be fixed and dilated and the schlera dry. He examined McCoy's body for signs of bleeding or other trauma and found none. He noted that McCoy had released his bowels and bladder. All of the above are, we note, medical signs that death has occurred, and only after noting all of such symptoms did Hatmaker conclude that McCoy was beyond resuscitation and treat the patient like a corpse. Far from exhibiting deliberate indifference to McCoy's welfare, the undisputed facts show that Hatmaker demonstrated genuine concern and urgency that was appropriate to the situation, and, at worst, he made an error in medical judgment. If the facts in *Tatum* supported a finding that careless, inconsiderate and deceitful ambulance crewmen were not grossly negligent, the court could not have reasonably found that the undisputed facts *sub judice,* as averred by the parties, would support an inference that Hatmaker had responded to McCoy's illness with grossly deficient care.

Just as appellant failed to present facts from which the court could infer that Hatmaker sought to injure McCoy or acted with willful indifference to his well-being, she cannot

point to facts in the record that show the court engaged in improper fact-finding. Indeed, we find it clear that all the court did was to apply the *Tatum* standard to the facts *sub judice*. In doing so, it weighed appellant's preferred inference and concluded that inference was untenable:

[APPELLANT'S COUNSEL]: [L]et me first address De-fendant Hatmaker and we agree that the standard is gross negligence. In the standard of gross negligence as cited in Tattum [*sic*] and I believe, Your Honor, that I do sight [*sic*] cases other than Tattum [*sic*] throughout my brief, but you can be the judge of that, pun intended—but in Tattum [*sic*] it says the standard of gross negligence is a reckless disregard for human life.

THE COURT: A wanton or reck—okay.

[APPELLANT'S COUNSEL]: Right. And willful or wan-ton reckless disregard for [human] life and wanton, I be-lieve, Your Honor, means that you demonstrate a deliberate indifference or act as if this person does not have the right to live, his rights or her rights do not exist. Your Honor, this case is so much more egregious than Tattum [*sic*] that I will do as they did and go briefly through Tattum [*sic*]. In Tattum [*sic*], the paramedic arrives, attempts to do something, here paramedic Hatmaker did nothing.

THE COURT: Well, no that's not—that's—no he didn't—I don't think you can say that. You can say that he didn't do what your expert says he should have done but he did do something.

[APPELLANT'S COUNSEL]: Your Honor, I will go be-yond that.

THE COURT: Well, show me where it says he did nothing?

[APPELLANT'S COUNSEL]: Sure. He didn't do just what my expert says, he didn't do anything that the [MIEMSS] standard set forth.

THE COURT: Okay. He didn't do those things. When you say he did nothing, that means he didn't go to the patient, he didn't, I mean there are things that he did. You say that they're not sufficient.

[APPELLANT'S COUNSEL]: Right.

THE COURT: But, you can't say that he didn't do nothing [*sic*].

[APPELLANT'S COUNSEL]: I take that back then, Your Honor.

THE COURT: Okay.

Appellant countered and still contends that Hatmaker's failure to observe the MIEMSS and other treatment protocols equaled no action at all and gross negligence on its face. The MIEMSS protocols state that "[t]he goal of pre-hospital emergency medical services is to deliver a viable patient to appropriate definitive care as soon as possible." Appellant points out that the protocols set forth several criteria for emergency personnel to use in determining whether resuscitation is appropriate, including asking other persons at the scene about the patient's symptoms and condition; determining by use of a monitoring device that heart rhythms are incompatible with life; checking for the absence of electrical pulse activity; and, in the absence of obvious signs of death,[6] beginning basic and advanced life support procedures, including CPR, to continue until the patient reaches a hospital or a physician directs termination of treatment. Instead, after fully examining McCoy, Hatmaker pronounced him dead and proceeded to document the case as though the patient were dead-on-arrival. Deposition testimony shows that Hatmaker believed he had authority to do just that.

The court below found that, by *Tatum's* standard, it could not construe Hatmaker's failure to follow MIEMSS protocols as reckless disregard for McCoy's life. Instead, the court characterized his actions as a well-intended but wrong judgment call.

[APPELLANT'S COUNSEL]: In my—in my brief, I said he did something. He ran to the person and all he did was

---

**6.** The MIEMSS protocols define obvious death as injury incompatible with life, e.g., decapitation; signs of rigor mortis with post mortem lividity; or decomposition of body organs and not just of body extremities, which might also be present in live persons with gangrene.

a visual assessment of Mr. McCoy. That visual assessment isn't enough as set forth in their own protocol, in the [MIEMSS] protocols that he acknowledges. These protocols require certain steps that he has to do. Nowhere in these protocols does it say, Your Honor, that you can show up, look at someone, pronounce them dead, and call the medical examiner. The protocols set forth what he has to do.

THE COURT: Well, don't you think in Tattum [*sic*] the protocols set forth that you don't put somebody on a gurney in the back of the ambulance and don't strap them down when you get ready to drive?

[APPELLANT'S COUNSEL]: I don't know, Your Honor.

THE COURT: Well, I can tell you what, I bet dollars to donuts they do.

* * *

THE COURT: Are you saying there is ever a chance where he doesn't apply the standards? In other words, all the time failure to follow the standards is gross negligence.

[APPELLANT'S COUNSEL]: No, no, not at all.

THE COURT: When is it not?

[APPELLANT'S COUNSEL]: Not at all. If he—let's say for example that Hatmaker would have—he never even took him out of the car—let's say he gets there, does the examination, gets the medical consult immediately. Doctor, we've got somebody coming in. On the way there to the hospital with the medical consult trying to save the man's life. He doesn't intubate, he doesn't hook up a defibrillator, he doesn't bag the patient. Gets to the hospital, hands it off to the doctor—

THE COURT: What's different about that then [*sic*] what happened here?

[APPELLANT'S COUNSEL]: Because here he didn't do anything.

THE COURT: Well, you keep saying that he didn't do anything. He didn't do what you thought, but he did something.

[APPELLANT'S COUNSEL]: He did a quick visual assessment and called the medical examiner. The standards don't allow for him ever to do that unless he's obviously dead.... Because not following the standards is gross negligence....

THE COURT [Reading from *Tatum*]: "Gross negligence has been equated with willful and wanton misconduct. A wanton and reckless disregard for human life or for the lives of other [*sic*]. Those aren't to say that a wrong doer is guilty of gross negligence or acts wantonly and willfully, only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."

And frankly, I can not see any set of circumstances under which a fact finder could find in this case that the two Defendants meet, met that standard. The Plaintiffs, Plaintiff I should say, has stated several times that the Defendant Hatmaker did nothing. Perhaps I don't know, if that were true that might be gross negligence. Perhaps had he arrived on the scene and been told and instead of running to the car said, do you have a cigarette to someone and lit a cigarette and began to smoke a cigarette. I think under those circumstances that would well be something that would show utterly [*sic*] indifference to the rights of others, just total indifference.

But, here the evidence it [*sic*] to the contrary. All the evidence is that he ran to the car and that was something. The evidence is also that he took a stethoscope and tried to see if he heard a heartbeat, that is something. That he tried to get a pulse, that is something. That he looked to see if his eyes were dilated, that was something and that he saw that he expelled his bowels on himself, that was something.

The Plaintiff's position is that is [*sic*] was not enough and for purposes of this emotion [*sic*] I will assume that it was

not enough, but it was something and it did not amount to utter indifference to the rights of others. It did not—what it was, was a judgment by Defendant Hatmaker that this man was dead. *It was a judgment that was wrong but, it was a judgment that was made. It was not an action based on utter indifference and just simply saying—not saying but behaving in such a way is indifference as to whether or not Mr. McCoy lived or died. . . .*

If this is gross negligence then there's never a time when a medic and a police officer who doesn't fail to do everything they are suppose [*sic*] to do and someone—death results or it's not gross negligence. I mean there were judgments being made. The judgments may have been wrong, but they were not indifference [*sic*] judgments they were actual judgments.

We agree with the court's reasoning and believe it to be consistent with the standard we expressed in *Tatum.* Were we Baltimore City officials responsible for Hatmaker's job performance, we might recommend retraining in the protocols of emergency care, or even disciplinary action. As judges, however, we cannot equate a well—intended error in medical judgment—even if it costs the patient's life—with wanton and reckless disregard for the life of that patient. Medical protocols seek to establish best practices for successfully treating certain conditions. Failure to follow such protocols might sometimes be deliberate, but more often than not, we believe, such failure to heed them during an emergency would be purely accidental and, therefore, at most simple negligence.[7] Even resolving all inferences in appellant's favor, the undisputed facts here simply do not show that Hatmaker's failure falls into the former category. Appellant cannot point to *any* facts that show he made a *deliberate* choice not to give McCoy a chance to survive, and, at the end of the day, it is

---

**7.** *Cf. Pagotto v. State,* 127 Md.App. 271, 325–29, 732 A.2d 920 (1999) (distinguishing failure to follow department guidelines from failure to follow regulations), *aff'd,* 361 Md. 528, 762 A.2d 97, 2000 Md. LEXIS 698 (2000).

deliberateness that lies at the core of the *Tatum* standard of willfulness and wantonness.

We note, furthermore, that neither of appellant's experts would testify at deposition that Hatmaker's conduct was grossly negligent. Dr. John J. Shane, appellant's medical expert, testified as follows:

Q: There is no evidence, as I understand, from the materials that you have reviewed or from your testimony so far that Mr. Hatmaker knew Mr. McCoy?

A: No.

Q: There is no indication, is there, that Mr. Hatmaker arrived at the scene and decided that he was willfully going to harm this gentleman, was there?

A: No.

Q: There is no indication in the record or in any material you have reviewed or from any testimony you have reviewed that there was any grossly willful and wanton disregard for the person we know as Mr. McCoy as an individual?

A: No, no.

* * *

Q: *Where in your report do you use the term grossly negligent or gross negligence?*

A: *I do not use it in the report.* I think in my report, we went through it in detail, I think what I say is careless, callous and inappropriate.

Q: Well, when was the first time you heard the term grossly negligent?

A: Today.

Q: In this deposition?

A: Yes.

Q: So prior to Mr. Winkelman putting that question to you in this deposition, you had never heard that term used before?

A: No.

Q: What do you understand as to the meaning of that term under Maryland law?

[APPELLANT'S COUNSEL]: Objection. Calls for a legal conclusion. You can answer.

A: I am not a lawyer.

Q: Does that mean you have no understanding of what it means?

A: I have no understanding. Yes.

Even Dworkin, appellant's emergency services expert, whose affidavit affirmed gross negligence, testified that Hatmaker had simply erred:

Q: Is it your opinion in this case that Paramedic Hatmaker simply *made an error or a mistake* in failing to initiate life-saving measures in—in pronouncing Mr. McCoy dead?

A: *That's my opinion, yes.*

Such equivocal testimony draws the case *sub judice* even more tightly into the realm of *Tatum. See Tatum*, 80 Md.App. at 568–69, 565 A.2d 354 (upholding dismissal of claims against county under Good Samaritan Act because plaintiff's own expert failed to testify that any of EMTs actions constituted reckless disregard for human life).

Finally, appellant implies that discrepancies regarding the timing of Hatmaker's arrival on the scene create a triable issue of fact. Seeking to shorten the time between McCoy's cardiac arrest and Hatmaker's arrival, she crafts her rendition of the facts to omit any mention of the original ambulance call, during which Medic 5 went to the wrong location. Both Officer Schwaab and Hatmaker testified at deposition that the ambulance had been misdirected, and we thus find appellant's representation of the timing of events to be disingenuous at best. When all the facts are presented, appellant can do nothing more than baldly allege that Hatmaker acted with reckless and wanton disregard for McCoy's life. Such allegations would not defeat appellees' motion for summary judgment, for neither bald assertions nor the existence of some alleged factual dispute will defeat a properly supported motion like the one *sub judice. See Barber v. Eastern Karting Co.,*

108 Md.App. 659, 672, 673 A.2d 744 (1996); *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 243, 603 A.2d 1357 (1992).[8]

---

8. Neither expert, we also note, was willing to aver that had Hatmaker followed recommended protocols McCoy would have survived. Dworkin, in fact, hedged when asked about the amount of time that would have elapsed between cardiac arrest and the point at which McCoy could no longer be a viable patient:

> Q: Do you have an opinion that you hold to a reasonable degree of pre-hospital emergency medical services certainty as to at what period of elapsed time Mr. McCoy would no longer have been a viable patient?
> [APPELLANT'S COUNSEL]: Objection.
> A: I can't answer that. There are—there are, again, many factors and I don't know (a) exactly the time that he did go into cardiac arrest versus the time that the EMS responding units and police units responded, and there are also other factors associated with temperature, and so forth.

Likewise, Dr. Shane, when asked about the likelihood of a successful resuscitation in this case, would provide no empirical basis for his opinion that patients in McCoy's condition, as observed by Hatmaker, often survived:

> A: Because I know there are many patients, but there is no way to specifically ascertain the number because it is not a matter that there is a specific statistical log kept of those patients; but there certainly are many of them.
> Q: When you say many, are you talking about one? Ten? One hundred? One thousand? What do you mean by many?
> [APPELLANT'S COUNSEL]: Objection. Go ahead.
> A: Certainly hundreds.
> Q: What's your basis for saying there are certainly hundreds?
> A: Because there are certainly hundreds of patients who have so survived, and it is those patients that become the basis for people continuing CPR beyond five or six minutes....
> Q: I apologize if my question was not clearly phrased. I am not interested at the moment in what the standard of care is with respect to the administration of CPR.
> What I am interested in examining just now, Doctor, is the empirical basis for your testimony that patients do survive beyond the five or six minute threshold, and that is the majority of patients survive?
> A: That is my opinion. Yes.
> Q: Now, you said there are hundreds of such patients. My question is how do you know there are hundreds of such patients?
> A: Because I know that is our global experience, and I know that is the global experience regionally and nationally; but, again, I don't think there is a statistical network to access. And I think that's what you are looking for is give me a precise number. I don't think that is available anywhere.

**B**

Appellant also asserts that the trial court erred in granting Officer Schwaab's motion for summary judgment. As a member of the Baltimore City Police Department, Officer Schwaab has been trained as a first responder, subject to first responder protocols set forth in J. David Bergeron & Gloria Bizjak, *Brady First Responder* (5th ed.). According to *Brady*, first responders who are on duty must assist any patients they find according to their departments' standard operating procedures. In Baltimore, police officers who arrive on the scene of a distressed patient before more specialized medical personnel arrive must start CPR. Officer Schwaab is also certified as an EMT and subject, like Hatmaker, to MIEMSS protocols.

In his deposition testimony, Officer Schwaab acknowledged his duty to begin CPR when he reached the scene, and indeed he brought with him a personal resuscitation mask for that purpose. Yet, as he explained, the arrival of Fire Department personnel coincided with his own arrival and he left the job for others to do:

Q: I believe you said once you got there it was almost immediate that you saw the Fire Department and the paramedics?

A: Right.

Q: If they hadn't been there immediately and Mr. McCoy presented the way you said,[9] what would you have done?

---

Indeed, we believe the absence of such testimony from appellant's witnesses shows there also existed no triable issue as to causation, although that issue is not on appeal here.

**9.** Earlier in the deposition, Officer Schwaab described McCoy's condition when he reached the scene:

[H]e was slumped forward. And what I did was—I could see saliva coming out of his mouth, and he had like an ash in [*sic* ] color to him, so I tilted his head back.

There [were] no signs of an accident or anything like that, so I wanted to make sure his airway was open. So as I tilted his head back and checked his pulse, he had none.

[APPELLEE'S COUNSEL]: Objection.

[APPELLEE'S COUNSEL]: Objection.

[APPELLANT'S COUNSEL]: You can answer.

A: I would have asked Officer Bradley to help me. I would have got him out of the car and used my mask, and we would have did CPR on him until the fire department arrived.

Q: Why would you have done that?

A: Well because that's the kind of person I am and them not being on the scene yet, not knowing where they were coming from, I would have initiated CPR until they got there like I've done in the past.

From this colloquy, appellant flatly concludes that Officer Schwaab's failure to begin CPR posthaste constituted reckless disregard for life and thus gross negligence. His negligent act, she argues, overcomes any immunity Officer Schwaab might have. We disagree.

As a trained EMT, Officer Schwaab enjoys the immunity provisions of the Good Samaritan Act and the analysis for Hatmaker *supra* applies here as well. To be sure, under the standard for simple negligence, appellant might have reasonably second-guessed Officer Schwaab's medical judgment. Under simple negligence, she might have created an issue of material fact as to Officer Schwaab's failure immediately to pull McCoy from the automobile and begin CPR at the instant of diagnosis, rather than allow Medic 5—which was already in sight—to reach the scene, so that more experienced rescue personnel could take over. The court properly refused, however, to raise any questions about Officer Schwaab's judgment under the tougher standard of wanton and reckless disregard for life. If anything, one might infer from Officer Schwaab's actions an intention to procure the best medical help available at the time. Appellant thus failed to identify a genuine issue

---

I didn't walk. I actually ran up to the medic unit and said: "This man is in full cardiac arrest" and started back towards where Bradley, the car, and Mr. Lowe were.

of material fact that would have precluded summary judgment on the grounds of immunity under the Good Samaritan Act.

 Even if appellant could have proven gross negligence, Officer Schwaab, as a law enforcement official, also qualifies for public official immunity under the rule of *DiPino v. Davis*, 354 Md. 18, 48–49, 729 A.2d 354 (1999). Such immunity is hard to defeat. Under the rule of *DiPino*, the court must find that two factors exist simultaneously before it can relieve a governmental official of liability for his negligent acts. First, the actor whose conduct is at issue must be a public official rather than a mere government employee or agent. Second, the tortious conduct must have occurred while he was performing discretionary rather than ministerial acts in furtherance of his official duties. If the official can establish these two factors, he receives qualified immunity, that is, immunity in the absence of malice. *DiPino*, 354 Md. at 48–49, 729 A.2d 354.

 Under *DiPino*, Officer Schwaab qualifies for immunity in the absence of malice. Police officers are public officials who, when carrying out their official duties, receive immunity in the absence of actual malice. *See Williams v. Mayor & City Council of Baltimore*, 128 Md.App. 1, 15, 736 A.2d 1084 (1999) ("The Maryland case law establishes unequivocally that police officers in the course of their public duties are public officials within the contemplation of the qualified immunity law."), *rev'd on other grounds*, 359 Md. 101, 753 A.2d 41 (2000). Even accepting appellant's factual scenario, Officer Schwaab was clearly engaged in discretionary public duties when, acting on a radio call for assistance, he raced to the site of the medical emergency, attended briefly to McCoy, then turned the case over to more qualified personnel.

 Because he meets the first two elements of the *DiPino* test, we need only examine his actions for malice. *Id.* at 19, 729 A.2d 354 ("When the affirmative conditions for qualified immunity are satisfied, the only qualifier limiting such immunity is the presence of malice on the part of the officer."). We have defined actual malice necessary to defeat public official

immunity as " 'an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.' " *Leese v. Baltimore County,* 64 Md.App. 442, 480, 497 A.2d 159 (1985) (quoting *Arrington v. Moore,* 31 Md.App. 448, 464, 358 A.2d 909 (1976)); *see also Thacker v. Hyattsville,* 135 Md.App. 268, 300, 762 A.2d 172, 2000 Md.App. Lexis 149, at *39–*40 (2000); *Shoemaker v. Smith,* 353 Md. 143, 164, 725 A.2d 549 (1999); *Williams,* 128 Md.App. at 19, 736 A.2d 1084; *Thomas v. City of Annapolis,* 113 Md.App. 440, 455, 688 A.2d 448 (1997).

The facts, viewed in the light most favorable to appellant, cannot be construed to show such evil or rancorous motives. Officer Schwaab did not ignore or refuse to treat McCoy. He did not act with intent to make McCoy more ill than he already was or to cause his death. Instead, Officer Schwaab assessed McCoy's physical condition with the intent of starting resuscitation, and before he could even begin life-saving measures, the ambulance arrived. Seeking immediate help from more experienced medical personnel, Officer Schwaab ran to the ambulance and told the crew of McCoy's condition. There is *no* evidence that Officer Schwaab acted with evil or rancorous motive influenced by hate for the purpose of deliberately and willfully injuring McCoy. We thus affirm the trial court's grant of summary judgment on Officer Schwaab's motion.

## II

Appellant also questions the court's exercise of discretion when it excluded Dworkin's affidavit and relied alone upon his expert testimony as to the standard of care for EMTs. The affidavit said what Dworkin had been unwilling to say in deposition, namely, that "the acts and/or omissions of Defendant Hatmaker and Defendant Schwaab constituted not only a breach in the standard of care by falling well below the recognized standards but that these acts and/or omissions constituted a reckless disregard for the life of William McCoy

and resulted in his death." Appellant avers that she presented Dworkin's affidavit as "the direct result of this Court's ruling in *Tatum v. Gigliotti*," in which this Court held that plaintiff's expert on the standard of care had failed to testify that any of the paramedics' actions showed a reckless disregard for human life. *See Tatum*, 80 Md.App. at 569, 565 A.2d 354.

Hatmaker moved to strike this affidavit on the basis of the sham affidavit rule articulated by this Court in *Pittman v. Atlantic Realty Co. See Pittman*, 127 Md.App. at 255, 732 A.2d 912 (excluding an affidavit that contradicted deposition testimony when it was submitted after the close of discovery). The court granted Hatmaker's motion:

> So, I am going to grant the motion to strike for two reasons. I'm going to grant one because I believe it contradicts under Pittman. I'm going to grant for the second reason because I am not convinced that this expert in remedy [*sic*] in that part of the opinion....
>
> In essence, I mean this is the appropriate question to the asking witness, was there a breach in the standard of care, not what is their opinion? [*Tatum*] doesn't say well this amounts to legal negligence, that's for the jury to decide and here the witness is going not just that it amounts to legal gross negligence and there's nothing to indicate that this witness has the knowledge, skill, experience, training or education to make that legal conclusion. For those, so for those reasons I'm going to grant the motion to strike.
>
> Now, I'll emphasize it's not just because of the close of discovery, but it's the second that questioning the competency of the witness to testify as to that.

Since the motions hearing took place, however, the Court of Appeals reversed our holding in *Pittman* regarding the sham affidavit rule. *See Pittman v. Atlantic Realty Co.*, 359 Md. 513, 536–39, 754 A.2d 1030 (2000). Citing that Court's new ruling, appellant argues that the trial court's judgment here cannot stand.

By focusing exclusively on *Pittman*, however, appellant ignores the lower court's secondary reason for striking the affidavit, that Dworkin was not qualified to testify to a legal conclusion of negligence, rather than individual elements of the same, *i.e.*, standard of care, breach of duty, and causation of damages. To allow Dworkin to testify that Hatmaker had acted with reckless disregard for McCoy's welfare, the court reasoned, would have permitted testimony in the form of a legal opinion and usurped the role of the jury. We agree.

Maryland Rule 5–702 gives the trial court discretion in determining whether expert testimony may be admitted:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Such discretion is quite broad, *see Bentley v. Carroll*, 355 Md. 312, 339, 734 A.2d 697 (1999) (trial court is afforded wide latitude in ruling on the admissibility of expert testimony), and applies to summary judgment proceedings as well as at trial. *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs.*, 109 Md.App. 217, 286, 674 A.2d 106 (1996) (citing *Helinski v. Rosenberg*, 90 Md.App. 158, 166, 600 A.2d 882, *rev'd on other grounds*, 328 Md. 664, 616 A.2d 866 (1992)), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997). "Reckless disregard" is a legal standard. As the trial court correctly observed, Dworkin was not an expert in the law, but instead, was hired by appellant to present testimony regarding the standard of care for EMTs. The trial court thus did not abuse its discretion when it found that Dworkin lacked the knowledge, skill, experience, and training to testify as to conclusions of law.

The court below also pointed out that to allow Dworkin to label Hatmaker's actions as reckless disregard would usurp the role of the jury, in contravention of recent opinions of this Court. *See, e.g., Burdette v. Rockville Crane Rental, Inc.,* 130 Md.App. 193, 745 A.2d 457 (2000). We agree. In *Burdette,* also a wrongful death and survival action, we upheld the trial court's discretionary ruling to strike testimony of plaintiff's accident reconstruction witnesses as to the cause of a traffic accident. Although we recognized the discretionary nature of such rulings, we pointed out that plaintiffs had in fact asked their experts to make a legal conclusion and not a factual one. "[T]he jury," we wrote, "was well-equipped to assess the facts and assign legal responsibility. The trial court did not abuse its discretion." *Id.* at 211, 745 A.2d 457; *see also Franceschina v. Hope,* 267 Md. 632, 642–44, 298 A.2d 400 (1973) (on questions of law, judge must instruct jury and jury must draw conclusion; legal conclusion or legal standard is not proper subject of expert testimony). Here, the holding of *Burdette* surely applies. Were the trial court to have allowed Dworkin's conclusory affidavit, it would have abandoned its duty as expert in the law and taken from any potential jury—had one been empaneled—the role of sifting through the facts of Hatmaker's actions in this case and applying the law to those facts.[10] We thus uphold the ruling of the court below.

---

**10.** Cases from other states are also instructive. See especially *Norris v. Zambito,* 135 N.C.App. 288, 520 S.E.2d 113 (1999), which holds that the trial court properly struck expert opinion that police officers had been "grossly negligent" and shown "reckless disregard" for the safety of others in pursuing high speed chase. *Norris* rejects the argument that N.C. Rule 5-704, which is identical to Md. Rule 5-704 ("testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact"), allows such testimony:

As a general rule, an expert may not testify as to whether a certain legal standard has been met.... Opinion testimony may be received regarding the underlying factual premise, which the fact finder must consider in determining the legal conclusion to be drawn therefrom, but may not be offered as to whether the legal conclusion *should* be drawn.

520 S.E.2d at 116. The court went on to describe two reasons for excluding testimony that suggests a legal conclusion:

## III

■ Finally, we hold that the motion to quash and protective order were properly granted. The Fire Department's review of the actions of an EMT, and any records, statements, or files obtained or generated in connection with the same, are not subject to discovery. The Department undertakes such reviews to ensure that its EMTs give the best care possible to persons requiring emergency assistance. In this way, the Department's internal review of Hatmaker's actions is part of its quality assurance process and is, therefore, protected from disclosure in litigation.

Section 14–501 of the Health Occupations Article provides, in pertinent part, that "the proceedings, records and files of a

"The first is that such testimony invades not only the province of the jury but 'the province of the court to determine the applicable law and instruct the jury as to that law.' (citation omitted) It is for the court to explain to the jury the given legal standard or conclusion at issue and how it should be determined. To permit the expert to make that determination usurps the function of the judge. The second reason is that an expert is in no better position to conclude whether a legal standard has been satisfied or a legal conclusion should be drawn than is a jury which has been properly instructed on the standard or conclusion."

*Id.* (citing *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 587, 403 S.E.2d 483 (1991)). A Michigan case, *Koenig v. South Haven*, 221 Mich.App. 711, 562 N.W.2d 509 (1997), *rev'd in part, on other grounds*, 460 Mich. 667, 597 N.W.2d 99 (1999), is also instructive. In this case, a government employee claimed immunity from tort liability under a statute with a gross negligence standard much like the Good Samaritan Act. The statute defined gross negligence as conduct "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at 515. Plaintiff's expert opined that the defendant has acted "so recklessly as to demonstrate a substantial lack of concern for whether an injury resulted." *Id.* at 516. The trial court struck that testimony, noting that to allow it "could have unduly invaded the province of the jury." *Id.* at 515. The Michigan Court of Appeals affirmed. *See also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.D.C.1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is in his or her province alone to instruct the jury on the relevant legal standard."); *Harrison v. Wells Fargo Bank*, 1999 WL 130176, at *6, 1999 Tex.App. Lexis 1691 at *20 (March 11, 1999) (rendering expert testimony inadmissible because it consisted "solely of opinions concerning the existence and extent of a trustee's duties which is a question of law").

medical review committee are not discoverable and are not admissible in any civil action arising out of matters that are being reviewed and evaluated by the medical review committee." Md.Code (1981, 2000 Repl.Vol.), § 14–501(d)(1) of the Health Occupations Article. The statute defines a medical review committee by listing the categories of committees that generate protected records, including "committee[s] appointed by or established in the Maryland Institute for Emergency Medical Services Systems." § 14–501(b)(4). The statute further defines the term "medical review committee" by articulating the functions that a covered committee would perform. A medical review committee:

(1) Evaluates and seeks to improve the quality of health care provided by providers of health care;

(2) Evaluates the need for and the level of performance of health care provided by providers of health care;

(3) Evaluates the qualifications, competence, and performance of providers of health care; or

(4) Evaluates and acts on matters that relate to the discipline of any provider of health care.

HO § 14–501(c).

Here, for the purpose of its efforts to control the quality of EMT activities, the Fire Department falls within the statutory definition of a "medical review committee." Although no evidence shows that Lt. Shelley took action at the behest of MIEMSS—indeed, as appellant notes, the investigation came forth from concerns voiced by McCoy's son—that agency coordinates *all* public emergency medical services in this State. *See* Md.Code (1978, 1999 Repl.Vol.), §§ 13–503 & –504 of the Education Article. The governing body of MIEMSS, the State Emergency Medical Services Board, ED § 13–503(c), oversees the licensing of EMTs and continuing quality control in the profession. *See, e.g.,* ED §§ 13–509, –515, –516.

It would thus seem that any *ad hoc* quality control study or investigation performed by a public provider of emergency medical services like the Baltimore City Fire Department would fall under the aegis of MIEMSS and within the scope of

section 14–501(b)(4). Certainly, Lt. Shelley and the Fire Department sought to "[e]valuate[ ] the . . . level of performance of health care provided by providers of health care," ED § 14–501(c)(2); "[e]valuate[ ] the . . . competence . . . and performance of providers of health care," § 14–501(c)(3); and "[e]valuate[ ] and act[ ] on matters that relate to the discipline of any provider of health care." § 14–501(c)(4). Moreover, although medical review committees are most often associated with hospitals or other traditional health care facilities, a review by the Fire Department would constitute a protected action when, as here, the fundamental *purpose* of the review was the improvement of health care services provided by Fire Department paramedics. *See Brem v. DeCarlo, Lyon, Hearn & Pazourek,* 162 F.R.D. 94 (D.Md.1995). The *origin* of the complaint that led to the review—with the McCoy family—does not change its purpose.

Given its purpose and sponsorship, the confidentiality provision of section 14–501 applies in the case *sub judice.* The provision "was intended to provide 'broad statutory protection' and is based on 'legislative appreciation that a high level of confidentiality is necessary for effective medical peer review.'" *Id.* at 98 (citing *Baltimore Sun Co. v. University of Md. Med. Sys. Corp.,* 321 Md. 659, 668, 584 A.2d 683 (1991)). With few exceptions enumerated in the statute, materials protected by section 14–501 are confidential and not discoverable, and, even when they end up in the hands of the other party to litigation, as they did here, they are inadmissible in court. The trial court did not abuse its discretion in granting an appropriate order, and we affirm.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**