*Joseph Stracke, et al. v. Estate of Kerry Butler, Jr., et al.*, No. 64, September Term 2018.
Opinion by Hotten, J.

**SURVIVAL AND WRONGFUL DEATH ACTION – GROSS NEGLIGENCE – SUFFICIENT EVIDENCE –** The Court of Appeals held that Respondents failed to present sufficient evidence at trial that Petitioners' conduct amounted to gross negligence, and that the trial judge did not err in granting Petitioners' motion for Judgment Notwithstanding the Verdict. "[G]ross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences[,]" and represents an utter indifference to the life and property of another. *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007). Viewing the evidence in light most favorable to Respondents, Petitioners assessed the patient, took his vitals, and promptly transported him to the nearest hospital within seven minutes of first arriving on the scene. "[A] well-intended error in medical judgment – even if it costs the patient's life – [does not equate to a] wanton and reckless disregard for the life of that patient." *McCoy v. Hatmaker*, 135 Md. App. 693, 713, 763 A.2d 1233, 1244 (2000). There was not legally sufficient evidence that Petitioners made a deliberate choice not to give their patient a chance to survive. Accordingly, the evidence at trial was insufficient to elevate Petitioners' conduct to gross negligence.

**STATUTORY INTERPRETATION – THE FIRE AND RESCUE COMPANY ACT – IMMUNITY FOR MUNICIPAL DEPARTMENTS –** The Court of Appeals held that the Fire and Rescue Company Act, Cts. & Jud. Proc. § 5-604(a) unambiguously confers immunity upon municipal fire departments and its employees. The Court declined to revisit and overturn its prior decision in *Mayor and City of Baltimore v. Chase*, 360 Md. 121, 756 A.2d 987 (2000), which held that § 5-604(a) immunity applies to municipal fire and rescue companies and their employees, as well as to volunteer and private rescue companies.

IN THE COURT OF APPEALS

OF MARYLAND

No. 64

September Term, 2018

_____

JOSEPH STRACKE, *et al.*

v.

ESTATE OF KERRY BUTLER, JR., *et al.*

_____

Barbera, C.J.,
*Greene,
McDonald,
Hotten,
Getty,
Booth,
Wilner, Alan M.
(Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Hotten, J.
Barbera, C.J., McDonald, and Wilner, JJ.,
dissent.

_____

Filed: August 16, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of the Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this Opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Estate of Kerry Butler, Jr., Ms. Crystal Butler, the widow of Kerry Butler, Jr., Vera Ganey, parent and guardian of Kerry Butler, Jr.'s sole minor child, and Mr. Kerry Butler, Sr., the father of Kerry Butler, Jr. (collectively referred to as "Respondents"),[1] filed a wrongful death and survival action in the Circuit Court for Baltimore City.[2] Respondents alleged that Baltimore City Fire Department medics, Joseph Stracke and Stephanie Cisneros (collectively referred to as "Petitioners"),[3] were grossly negligent in their treatment of Mr. Butler, and that their gross negligence caused his ultimate demise.

After a jury found that Petitioners were grossly negligent, the trial judge granted Petitioners' Motion for Judgment Notwithstanding the Verdict ("JNOV"). Respondents appealed to the Court of Special Appeals, which reversed the trial court's grant of JNOV on the basis that Petitioners were grossly negligent and not entitled to immunity under the

---

[1] For purposes of this opinion, Kerry Butler, Jr. will be referred to as "Mr. Butler," and his wife, Crystal Butler, will be referred to as "Ms. Butler."

[2] At the time of filing, the plaintiffs included: 1) the Estate of Kerry Butler, Jr., by his wife Crystal Butler; 2) Crystal Butler, individually; 3) Kerry Butler, Sr., individually as father to Kerry Butler, Jr.; and 4) Vera Ganey, as parent and guardian to Kerry Butler, Jr.'s sole surviving minor child. On May 9, 2019, an On Omnibus Motion to Substitute and Join Parties was filed, requesting that: 1) Cynthia Jones, personal representative of the Estate of Crystal Butler, who had since passed away, be substituted for and instead of Crystal Butler in her individual capacity; 2) Malcolm Butler, substitute personal representative of the Estate of Kerry Butler, Jr., be substituted for and instead of Crystal Butler as the personal representative of the Estate of Kerry Butler, Jr.; and 3) the Estate of Kerry Butler, Sr., by and through its personal representative, Jeanette Corbett-Butler, be joined or otherwise made a party to this appeal in accordance with Md. Rule 1-203(d). We granted this Motion.

[3] The Mayor and City Council of Baltimore was initially named as a defendant in the action. However, the circuit court dismissed them as a party pursuant to the doctrine of governmental immunity.

Fire and Rescue Company Act, Maryland Code, Courts & Judicial Proceedings ("Cts. & Jud. Proc.") § 5-604(a). On appeal and cross-appeal, we are asked to consider the following issues:

1. Does willful or gross negligence by an *omission* defeat the immunity from liability granted to fire and rescue personnel by the Maryland Fire and Rescue Company Act, Md. Code, Courts & Judicial Proceedings § 5-604, or is the immunity lost only by a willful or grossly negligent affirmative act?

2. Did CSA err in finding sufficient evidence that Petitioners committed gross negligence that caused the death of a patient, when undisputed evidence established that Petitioners assessed the patient, including taking vital signs, and within seven minutes transported the patient to the hospital, where his condition suddenly worsened?

3. Does § 5-604 afford Petitioners, as employees of a fire department, limited immunity against claims for simple negligence?

For the reasons outlined below, we conclude that Petitioners were not grossly negligent in their treatment of Mr. Butler, and were therefore afforded immunity under the Fire and Rescue Company Act, Cts. & Jud. Proc. § 5-604(a).[4] Because we hold that Petitioners were not grossly negligent, we decline to address the first issue presented. We further hold that Cts. & Jud. Proc. § 5-604(a) does, and continues to, grant immunity against simple negligence claims to employees of a fire department. Accordingly, we reverse the judgment of the Court of Special Appeals.

**FACTUAL AND PROCEDURAL BACKGROUND**

---

[4] Cts. & Jud. Proc. § 5-604(a) provides:
> [n]otwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.

*Factual Background*

Just after 1:00 a.m. on March 2, 2011, Mr. Butler woke his wife allegedly complaining of chest pains. Earlier that evening, Mr. Butler had eaten a spicy chicken sandwich and Oreo cookies, and drank a Hawaiian punch beverage prior to going to bed. Ms. Butler called 9-1-1 and reported that her husband was experiencing chest pain and having difficulty breathing and speaking. Ms. Butler helped dress Mr. Butler and assisted him down the steps to the first floor of their home to wait for the emergency medics.

Stracke and Cisneros were dispatched to the Butlers' home in response to the 9-1-1 call for a reported chest pain emergency. Stracke and Cisneros are both first responders, whose primary responsibilities involve the assessment and transportation of patients. Neither Stracke nor Cisneros are responsible for diagnosing medical conditions. Petitioners arrived on the Butlers' street at approximately 1:18 a.m. Petitioners experienced some difficulty locating the residence because the relatively unlit street made it difficult to identify the house numbers, and there had been inconsistencies between the reported address and the actual location of the Butlers' house.[5] Due to the lack of lighting, Stracke promptly exited the ambulance and walked along the street in order to locate the correct house while Cisneros remained in the ambulance. When Stracke reached Ms. Butler at the correct address, around 1:20 a.m., he relayed his location to Cisneros, who remained in the ambulance.

---

[5] Dispatch reported the address to Petitioners as 850 Bethune Road, however, the Butlers' correct address was 860 Bethune Road.

By the time Stracke reached the Butlers' residence, Ms. Butler was standing just outside the front door and Mr. Butler was sitting in a chair just inside the house. At the time, Mr. Butler was 28 years old, five feet and seven inches tall, and approximately 245 pounds. Without entering the house, Stracke asked in a loud voice "what seems to be the problem." Ms. Butler responded that Mr. Butler had told her that he thought he was having a heart attack. According to Ms. Butler, Mr. Butler had his hand on his chest. Stracke asked Mr. Butler "what's going on my main man[]" and Mr. Butler responded that "[his] right side hurt." While standing in front of the Butlers' residence, Stracke visually assessed Mr. Butler, in accordance with relevant medical protocols, observing that he was "a good shape gentleman[.]" Stracke expressed the desire and need to bring Mr. Butler to the ambulance for further evaluation and possible treatment.

Ms. Butler then claimed that Mr. Butler stood up and staggered the short distance to the ambulance, approximately 30-40 feet, without the aid of Stracke or a stretcher. Stracke, however, claimed that he instructed Mr. Butler to wait while he retrieved a stretcher, but Mr. Butler declined, stating that he was "ready to go" and began walking to the ambulance on his own accord. Stracke quickly signaled to Cisneros prior to escorting Mr. Butler from his residence to the ambulance, and Cisneros promptly exited the ambulance with a medical bag and oxygen bottle in order to fully and properly assess Mr. Butler's condition.

Cisneros performed a visual assessment of Mr. Butler as he approached the ambulance. Ms. Butler stated that Mr. Butler was staggering as he walked to the ambulance, while Cisneros observed that Mr. Butler was taking "perfectly normal" steps

and did not appear to be in need of any assistance. According to Petitioners, Mr. Butler entered the ambulance unassisted and without difficulty. When Cisneros asked Mr. Butler what was going on, Mr. Butler responded that his throat was burning (he was holding his hand to his throat) and that he had "[c]hest heartburn." Although Cisneros recorded this symptom as "chest hurt" in Mr. Butler's chart, she explained that this was primarily due to a lack of accurate options that were provided from a drop-down menu on the form.

Inside the ambulance, Stracke took Mr. Butler's blood pressure, heart rate, and blood oxygen level, while Cisneros recorded these measurements in Mr. Butler's chart. Cisneros also checked Mr. Butler for reproducible pain under his right arm (there was none), felt his pulse, checked his pupils, looked at his skin, and listened to his lungs, which were "perfectly clear." All of Mr. Butler's vitals appeared to be baseline, indicating that he was in stable condition.

Petitioners determined that Mr. Butler should be transported to the nearest hospital, Harbor Hospital, which was less than a mile away. Around 1:24 a.m., approximately seven minutes after first arriving on the Butlers' street, Petitioners and Mr. Butler departed for the hospital, with Stracke driving the ambulance and Cisneros remaining with Mr. Butler in the rear of the ambulance. Stracke explained that at this time, it was Petitioners' priority "to deliver a viable patient to appropriate definitive care, here Harbor Hospital, as soon as possible[.]" According to Cisneros, Mr. Butler was seated in a "position of comfort" and "very pleasant" and "very chatty" during the drive to the hospital. The ambulance arrived at Harbor Hospital approximately three minutes later, around 1:27 a.m. Stracke immediately retrieved a wheelchair for Mr. Butler, who exited the ambulance unassisted

but without difficulty, and sat in the wheelchair.  Stracke pushed Mr. Butler directly into the emergency room while Cisneros alerted hospital staff that Mr. Butler "had a burning in his throat."

Stracke waited with Mr. Butler in the emergency room for hospital staff to triage Mr. Butler.  While waiting in the emergency room, a hospital technician observed Mr. Butler holding his chest and complaining that his chest hurt.  The hospital technician observed this happening for another five to ten minutes, with Mr. Butler's voice growing louder as the time passed.  After waiting in the emergency room for approximately ten minutes, Mr. Butler became unconscious and began to slide out of his wheelchair.  Stracke prevented Mr. Butler's head from striking the floor as he slid out of the wheelchair.  Cisneros observed Mr. Butler's condition and called for a nurse and doctor, who took Mr. Butler to a code room with the assistance of Stracke.  After Mr. Butler was taken to the code room, and while he was receiving treatment from hospital staff, Petitioners left the hospital and went back on service to prepare for the next potential dispatch call.

Despite the hospital staff's efforts, Mr. Butler could not be resuscitated and ultimately died.  At the time of his death, doctors were unable to identify Mr. Butler's cause of death.  Following an autopsy, the medical examiner concluded that Mr. Butler died of a myocardial infarction, more commonly known as a heart attack.

*Procedural Background*

Trial in the Circuit Court for Baltimore City

Respondents filed a wrongful death and survival action against Petitioners, and the Mayor and City Council of Baltimore ("the City") in the Circuit Court for Baltimore City.[6] Before commencement of trial, the City moved that the circuit court determine whether it was immune from suit under the doctrine of governmental immunity, and Petitioners moved that the circuit court determine whether the Fire and Rescue Company Act, Md. Code, Cts. & Jud. Proc. § 5-604(a) granted them civil immunity in the absence of any willful or grossly negligent act. The circuit court answered both questions in the affirmative, entering judgment in favor of the City due to its governmental immunity.[7] The suit against Petitioners proceeded to trial to determine whether Petitioners acted in a willful or grossly negligent manner.

At the close of Respondents' case, Petitioners moved for judgment on the ground that Respondents "ha[d] not proved that either [Petitioner], Stracke or Cisneros, was grossly negligent by a preponderance of the evidence[.]" The circuit court denied Petitioners' motion. Petitioners renewed their motion, on the same ground, at the close of all of the evidence, which the circuit court reserved ruling on until after the jury returned its verdict. Following deliberations, the jury found Petitioners were grossly negligent in

---

[6] Respondents filed a separate action against Harbor Hospital.

[7] The City's favorable judgment by the circuit court was not appealed by Respondents and is not an issue before this Court.

the treatment of Mr. Butler, that this gross negligence caused Mr. Butler's death, and accordingly, awarded Respondents $3,707,000. Following the announcement of the jury's verdict, Petitioners moved for a JNOV on the same grounds advanced in their earlier motions for judgment. The circuit court granted Petitioners' motion, concluding that Respondents' evidence of gross negligence was insufficient. Judgment in favor of Petitioners was entered by the circuit court on March 21, 2016.

Appeal to the Court of Special Appeals

Respondents filed a timely appeal to the Court of Special Appeals, and Petitioners filed a timely cross-appeal.[8] *Estate of Kerry Butler, Jr., et al. v. Joseph Stracke, et al.*, No. 238, 2018 WL 4761044 (Md. Ct. Spec. App. Oct. 1, 2018). The Court first determined that the circuit court erred in granting Petitioners' JNOV because "significant evidence existed to show that [Petitioners] acted grossly negligent." *Id.* at \*4. Because there was sufficient evidence of gross negligence, the Court reversed the circuit court's grant of Petitioners' JNOV, and ordered the circuit court to reinstate the jury's verdict in favor of Respondents.

---

[8] Respondents presented two questions for review, which the Court of Special Appeals rephrased as:
1. Did the trial court err in entering a judgment notwithstanding the verdict on the grounds of insufficient evidence?
2. Did the trial court err in ruling that [Petitioners] were entitled to limited immunity afforded by the Maryland Fire and Rescue Company Act?[]

Petitioners presented the single following question for review, which the Court also rephrased as:
3. Did the trial court err in denying [Petitioners'] motions for mistrial?[]

Although the Court of Special Appeals did consider this third issue, it was not appealed to the Court of Appeals and is therefore not before us for consideration.

Next the Court explained that, because it was bound by Court of Appeals' precedent in *Mayor & City of Baltimore v. Chase*, 360 Md. 121, 756 A.2d 987 (2000), the Fire and Rescue Company Act affords immunity in simple negligence cases to municipalities and their employees, not just volunteers. *Id.* at *6-7.

Senior Judge Lawrence F. Rodowsky, sitting specially assigned, dissented from the panel's majority opinion, citing "the breadth of the grant of immunity to members of the fire and rescue companies as recognized by [the Courts'] cases and, ultimately, as conferred by [the Fire and Rescue Company Act]." *Id.* at *10 (Rodowsky, J., dissenting). After assessing the evidence that was submitted at trial, Judge Rodowsky determined that the "evidence may or may not be sufficient to support a finding of negligence, but it is not evidence of gross negligence." *Id.* at *11. Judge Rodowsky also observed that even "if there is willful or gross negligence by an omission, the immunity [provided by Md. Code, Cts. & Jud. Proc. § 5-604(a)] is not lost." *Id.* at *13. Section 5-604(a) of Cts. & Jud. Proc., first introduced as Senate Bill 731 in the 1983 General Assembly session, originally read: "A volunteer fire company is immune from liability in the same manner as a local government agency for any act or omission in the course of performing its duties if . . . [t]he act or omission is not one of gross negligence." However, according to Judge Rodowsky, the General Assembly's removal of "omission" evidenced its intent to only withhold immunity for grossly negligent **acts**, not grossly negligent **omissions**. *Id.* at *13 (citing Chapter 546 of the Acts of 1983). Because Petitioners' gross negligence was based on their failure to properly question and examine Mr. Butler – *i.e.*, a failure to act – Judge

- 9 -

Rodwosky concluded that Petitioners' immunity under the Act was not defeated by their alleged grossly negligent omissions from action. *Id.*

Petitioners filed a timely petition for *certiorari* before this Court, and Respondents' filed a timely cross-petition. We granted *certiorari* on both Petitioners' petition and Respondents' cross-petition. *Stracke, et al. v. Estate of Butler, Jr., et al.*, 462 Md. 556, 201 A.3d 1228 (2019).

## STANDARD OF REVIEW

We review a grant or denial of a motion for JNOV for legal correctness, by "viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented." *Cooper v. Rodriguez*, 443 Md. 680, 706, 118 A.3d 829, 844 (2015) (quoting *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503, 16 A.3d 159, 163 (2011)). Gross negligence is a question of law "when reasonable [people] could not differ as to the rational conclusion to be reached." *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12, 14 (1968). "[I]f there is no rational ground under the law governing the case for upholding the jury's verdict, [JNOV] must be granted." *Bell v. Chance*, 460 Md. 28, 52, 188 A.3d 930, 944 (2018). In this context, if the non-moving party has offered sufficient evidence, so as reasonable minds might differ, that the moving party engaged in a grossly negligent manner, the motion for JNOV should be denied. *See Barnes v. Greater Balt. Med. Ctr., Inc.*, 210 Md. App. 457, 480, 63 A.3d 620, 634 (2013).

## DISCUSSION

*Petitioners were not grossly negligent in their treatment of Mr. Butler.*

"Issues involving gross negligence are often more troublesome than those involving malice because a fine line exists between allegations of negligence and gross negligence." *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007). Ordinary, simple negligence is "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm." *Id.* On the other hand, this Court has explained that "gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id.* We have made clear that a claim for gross negligence "sets the evidentiary hurdle at a higher elevation[.]" *Beall v. Holloway-Johnson*, 446 Md. 48, 64, 130 A.3d 406, 415 (2016).

"[A] wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Barbre*, 402 Md. at 187, 935 A.2d at 717.

> **Gross negligence is not just big negligence.** For these purposes, gross negligence "must be sufficient . . . to establish that the defendant . . . had a wanton or reckless disregard for human life . . . . Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind."

*Thomas v. State*, 237 Md. App. 527, 537, 186 A.3d 857, 863 (2018), *rev'd*, *State v. Thomas*, No. 33, 2019 WL 2574642 (Md. June 24, 2019) (quoting *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674, 681 (1990)) (emphasis added).

- 11 -

In *Beall*, we considered, *inter alia*, whether there was sufficient evidence to support a finding of gross negligence against a police officer whose cruiser collided with a fleeing motorcyclist during a high-speed chase, and which resulted in the death of the motorist. 446 Md. at 57-62, 130 A.3d at 411-14. We reiterated that a claim of gross negligence must be supported by sufficient evidence that the defendant "acted with 'wanton or reckless disregard for the safety of others[.]'" *Id.* at 64-65, 130 A.3d at 415 (quoting *Boyer v. State*, 323 Md. 558, 580-81, 594 A.2d 121, 132 (1991)). Even given this objectively higher threshold assigned to proving gross negligence, our opinion in *Beall* morphed the distinctions between simple and gross negligence by holding that "a legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." *Id.* at 64, 130 A.3d at 415.

We decline to further muddy this already unclear area of law. If in almost all instances where a plaintiff can prove negligence, and the case is submitted to the jury to consider gross negligence, then many first responders will be stripped of the protective shield that the immunity was intended to provide, forcing them to go through the entire litigation process when there is only evidence of simple negligence. This result runs contrary to the heightened threshold of gross negligence we have articulated, and in many cases, gross negligence will be treated as "just big negligence." *See Thomas*, 237 Md. App. at 537, 186 A.3d at 863.

The evidence submitted at trial of Petitioners' actions, or failures to act, while potentially sufficient to establish simple negligence, was not sufficient to establish gross negligence, even when taken in the light most favorable to Respondents as the non-moving

party. *See Cooper v. Rodriguez*, 443 Md. 680, 706, 118 A.3d 829, 844 (2015). Respondents point out that "if a trier of fact disbelieves part or all of a witness' testimony, that discredited testimony is assigned no weight and plays no role in the consideration of the ultimate issue." *Grimm v. State*, 447 Md. 482, 506, 135 A.3d 844, 858 (2016). However, "disbelief is not evidence in and of itself." *Id.* Even given this principle, there is not sufficient evidence to conclude that Petitioners made a deliberate and conscious choice to not help Mr. Butler survive. Assuming the facts as they were presented by Respondents, as the non-moving party, Petitioners still responded to Mr. Butler's 9-1-1 call, provided him with immediate attention and treatment, and transported him to the nearest hospital in under ten minutes.

In *Tatum v. Gigliotti*, the Court of Special Appeals concluded that a paramedic who failed to properly diagnose a medical condition and administer proper treatment, eventually leading to the patient's death, did not perform his duties in a grossly negligent manner. 80 Md. App. 559, 569, 565 A.2d 354, 358-59 (1989). There, the medic attempted to put a paper bag over the patient's face, believing that he was suffering from hyperventilation. *Id.* at 562, 565 A.2d at 355. However, the patient was actually suffering from a severe asthma attack. *Id.* The medics escorted the patient to the ambulance, but did not transport him on a stretcher. *Id.* While in the ambulance and en route to the hospital, the patient slid from his seat and fell onto the floor of the vehicle. *Id.* An emergency room nurse testified that when the patient arrived at the hospital, he was in cardiac arrest. *Id.* at 563, 565 A.2d at 355. The patient ultimately died from a lack of oxygen. *Id.* The Court of Special Appeals reasoned that, even considering these facts in the light most favorable to the

plaintiff, "[t]he evidence in [the] case indicated that although the actions of [the medic] may have amounted to negligence, they [did] not satisfy the threshold of gross negligence." *Id.* at 569, 565 A.2d at 358.

Similarly, in *McCoy v. Hatmaker*, the Court of Special Appeals concluded that a paramedic's failure to follow medical protocol and subsequent erroneous medical judgment was not sufficient to establish gross negligence. 135 Md. App. 693, 707-08, 763 A.2d 1233, 1241 (2000). There, paramedic Billie Hatmaker diagnosed the patient, William McCoy, as dead after observing him unconscious, having unresponsive eyes, a significantly lowered body temperature, and having already released bodily fluids. *Id.* at 699-702, 763 A.3d at 1236-38. Instead of performing advanced life support procedures, Hatmaker proceeded to fill out a Maryland Ambulance Information Sheet and called the police and medical examiner. *Id.* at 702, 763 A.3d at 1237-38. McCoy alleged that Hatmaker breached his duty of care to McCoy by failing to provide appropriate resuscitative medical treatment and by violating relevant Maryland State Protocol and Emergency Medical Technician/Paramedic Guidelines. *Id.* at 701-02, 763 A.3d at 1238. The Court of Special Appeals disagreed, reasoning,

> we cannot equate a well-intended error in medical judgment – even if it costs the patient's life – with wanton and reckless disregard for the life of that patient. Medical protocols seek to establish best practices for successfully treating certain conditions. Failure to follow such protocols might sometimes be deliberate, but more often than not, we believe, such failure to heed them during an emergency would be purely accidental and, therefore, at most simple negligence. Even resolving all inferences in [McCoy's] favor, the undisputed facts here simply do not show that Hatmaker's failure falls into the former category. [McCoy] cannot point to *any* facts that show he made a *deliberate* choice not to give McCoy a chance to survive, and, at the end of

the day, it is deliberateness that lies at the core of the *Tatum* standard of willfulness and wantonness.

*Id.* at 713-14, 763 A.2d at 1244 (footnote omitted) (emphasis in original).

Respondents and the Dissent point to Petitioners' failure to adhere to the Maryland Medical Protocols for Emergency Medical Services Providers ("the Protocols") and the Emergency Medical Services procedures set forth in the Baltimore City Manual of Procedures ("MOP") as evidence of Petitioners' gross negligence. The Protocols were developed to "help [Emergency Medical Service] providers anticipate and be better prepared to give the emergency patient care ordered during the medical consultation." The Protocols outline various procedures in which applicability and strict compliance varies based on the circumstances of the emergency response. For example, the Protocols mandate that algorithms for general patient care must be followed according to the specific sequence, but all other treatment protocols do not require a strict or mandatory sequence. There are also varying categories that certain procedures and instructions may fall under. Some sections of the Protocols merely describe and define illnesses or emergencies, and what symptoms those diagnoses may exhibit. If a paramedic determines that a patient is suffering from certain conditions, such as cardiac arrest or acute coronary syndrome ("ACS"), then the Protocols require specific procedures to be taken to ensure the safety of the patient. However, if a paramedic determines that a patient is not in fact suffering from a described condition, then the specific procedures do not necessarily have to be strictly followed. Additionally, other protocols in the Baltimore City MOP are explicitly situation dependent, including whether there are non-emergency passengers, the weight of the

patient, and the location or type of building the patient may be located in. Finally, some procedures are administrative, and do not primarily serve to support the health and safety of the patient. For example, if a patient refuses to be transported via stretcher, paramedics are instructed to obtain a signed and witnessed "release from responsibility" form.

The Protocols describe a patient who is experiencing ACS as someone with chest, epigastric (the area of the upper abdomen, just below the ribs), arm, or jaw pain or discomfort, and possible diaphoresis (sweating), nausea, shortness of breath, or difficulty breathing.[9] The Protocols explain that a patient with such symptoms should be placed into a position of comfort and transported to the nearest hospital cardiac catheterization center. In assessing the patient, the medics should first perform a visual assessment of the patient regarding their symptoms, then transport the patient to the ambulance via a stretcher. Respondents assert that "Petitioners violated virtually every [Protocol] and MOP policy governing their encounter with [Mr.] Butler." However, Petitioners did not "knowing[ly], conscious[ly], deliberate[ly]" fail to adhere to "virtually every protocol adopted both by the State agency authorized by law to promulgate such protocols and their own municipal employer[.]" Dissent at 1. Stracke visually assessed Mr. Butler while Mr. Butler was seated in his residence, and Cisneros conducted a visual assessment as Mr. Butler was escorted towards the ambulance. Additionally, Cisneros testified that Mr. Butler was in

---

[9] There is conflicting evidence and testimony regarding whether Mr. Butler was experiencing these symptoms and whether they were fully and properly assessed by Petitioners. However, because the standard of review for a JNOV considers the evidence in a light most favorable to the non-moving party, see *Cooper*, 443 Md. at 706, 118 A.3d at 844, we assume that Mr. Butler was displaying these symptoms, and that they were readily observable by Petitioners.

fact in a position of comfort while being transported to the hospital in the ambulance. Furthermore, the failure to adhere to protocols and policies does not itself establish a reckless disregard for human life or amount to gross negligence. *See Tatum*, 80 Md. App at 571, 565 A.2d at 359-60; *see also McCoy*, 135 Md. App. at 707-08, 763 A.2d at 1241.

Similar to *Tatum* and *McCoy*, here, Petitioners responded to a 9-1-1 call to give assistance to Mr. Butler. At the time of his death, Mr. Butler was 28 years old, five feet and seven inches tall, and weighed approximately 245 pounds. He had no history of heart problems and was apparently in relatively good health. Petitioners escorted Mr. Butler to the ambulance and conducted a number of assessments while there, including taking his blood pressure, heart rate, and blood oxygen levels. Believing Mr. Butler needed further care, Petitioners transported him to the closest hospital. Mr. Butler was brought into the emergency room less than ten minutes after making first contact with Petitioners. It was not until Mr. Butler had been waiting in the hospital for an additional ten minutes did his symptoms begin to worsen and he eventually went into cardiac arrest, at which point he was taken into the care of the hospital staff. There was no evidence submitted at trial or reflected in the record that contradicts these facts.

Hindsight is 20/20, and it is clear from the medical examiner's autopsy that Petitioners' assessment did not conform to Mr. Butler's actual medical condition and needs. It is true that Petitioners did not follow protocol by failing to transport Mr. Butler via stretcher from his home to the ambulance, and by transporting him to the nearest hospital rather than a cardiac catheterization center. While this may – or may not – be sufficient to establish negligent conduct, the evidence presented by Respondents is not

sufficient to establish gross negligence. "Gross negligence is not just big negligence." *Thomas*, 237 Md. App. at 537, 186 A.3d at 863, *rev'd*, *State v. Thomas*, No. 33, 2019 WL 2574642 (Md. June 24, 2019). The mere fact that Petitioners inaccurately diagnosed and treated their patient does not elevate their conduct to gross negligence. "[W]e cannot equate a well-intended error in medical judgment – even if it costs the patient's life – with wanton and reckless disregard for the life of that patient." *McCoy*, 135 Md. App. at 713, 763 A.2d at 1244.

Even if the jury disbelieved all of the evidence submitted by Petitioners, and all contradicted evidence was settled in favor of Respondents, it is undisputed that Petitioners made a concerted effort to locate Mr. Butler, assess him, take his vitals, and transport him to the nearest hospital for further review and treatment in less than ten minutes. Under these conditions, Petitioners did not possess a wanton and reckless disregard for Mr. Butler's life, nor did they present an utter indifference to his rights and well-being. On the contrary, Petitioners arrived at Mr. Butler's home, despite initially receiving an incorrect address, and provided the care they assessed as necessary for the situation before them. "There is no legally sufficient evidence that [Petitioners] made a deliberate choice not to give Mr. Butler a chance to survive." *Estate of Kerry Butler, Jr., et al. v. Joseph Stracke, et al.*, No. 238, 2018 WL 4761044, at *13 (Md. Ct. Spec. App. Oct. 1, 2018) (Rodowsky, J., dissenting). This does not represent "an intentional failure to perform a manifest duty in reckless disregard of the consequences[,]" or an utter indifference to the rights of others. *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007).

Finally, the practical implications of holding otherwise cannot be overstated. Concluding that Petitioners were grossly negligent would have a negative impact on not only the number of individuals who seek employment as first responders in the future, but would create a chilling effect on their conduct. First responders must have broad discretion to proceed in their assessment and treatment of patients without the fear of liability. Judges or juries would be permitted to engage in a *post hoc*, hindsight assessment of the first responders' conduct. In reality, the trier of fact cannot be expected to review the conduct as if they stood in the shoes of the first responders and made split-second decisions that could impact the health and life of those they are treating. First responders fulfill a vital role throughout our State, and we must not minimize their service by second-guessing their actions through a 20/20 lens.

*Section 5-604(a) provides immunity against simple negligence claims to employees of municipal fire departments.*

Assuming, *arguendo*, that Petitioners were merely negligent in their actions with respect to Mr. Butler, Respondents alternatively assert that Cts. & Jud. Proc. § 5-604(a) only confers immunity from simple negligence claims upon private and volunteer fire and rescue companies, not municipalities or their employees. Matters of statutory interpretation are questions of law that are reviewed *de novo*. *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175, 184 (2006). We must interpret a statute as "to give every word effect, avoiding constructions that render any portion of the language superfluous or redundant." *Blondell v. Balt. City Police Dep't*, 341 Md. 680, 691, 672 A.2d 639, 644 (1996). To that end, we will first look to the plain meaning of the statutory language, and

- 19 -

give effect to the clear and unambiguous language. *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204, 1206-07 (1994). If the language is unclear or ambiguous, we will then look to the legislative objectives and goals in order to discern the proper interpretation and construction. *Whack v. State*, 338 Md. 665, 672, 659 A.2d 1347, 1350 (1995). A review of the statute and our prior case law make clear that Cts. & Jud. Proc. § 5-604(a) unambiguously confers immunity from simple negligence claims upon municipal fire departments and their employees, as Petitioners indisputably are.

Our analysis begins and ends with our previous decision in *Mayor & City of Baltimore v. Chase*, 360 Md. 121, 756 A.2d 987 (2000), in which we concluded that the General Assembly intended the Fire and Rescue Company Act to immunize municipal and private fire departments, as well as their employees, from simple negligence claims. In *Chase*, a Baltimore City Fire Department paramedic was sued for alleged negligent and grossly negligent treatment of a patient. *Id.* at 124, 756 A.2d at 989. The Court of Special Appeals held that § 5-604(a) applied only to volunteer and private fire and rescue companies, and therefore did not bestow immunity upon municipal fire departments and their employees. *Id.* We reversed, determining that "fire company" and "rescue company" unambiguously included municipal fire departments and their personnel, and therefore the plain language of the statute controlled. *Id.* at 130-32, 756 A.2d at 992-94. We further explained that the General Assembly's exclusion of the word "volunteer" from the title of the original bill indicated their intent to afford immunity to all fire and rescue personnel, including municipalities and their employees, not just private and volunteer entities. *Id.* at 126, 756 A.2d at 990.

- 20 -

Despite this clear precedent in *Chase* that applies § 5-604(a) immunity to municipal fire departments, Respondents assert that our more recent opinion in *TransCare Maryland v. Murray*, 431 Md. 225, 64 A.3d 887 (2013), concluded that the terms "fire company" and "rescue company" were ambiguous, thus requiring this Court to revisit the interpretation of the statute and its legislative history. Respondents' position fails in two regards. First, we did not hold in *TransCare* that the phrases "fire company" and "rescue company" were, standing alone, ambiguous. We explained,

> [a]s TransCare is a commercial ambulance company, the application of [Cts. & Jud. Proc.] § 5-603(b)(3) to it depends, in part, on **whether the adjective "volunteer"** modifies only "fire department" or also modifies "ambulance and rescue squad." If "volunteer" modifies only "fire department," TransCare potentially has immunity as an "ambulance squad" (if its "members" have immunity). If "volunteer" also modifies "ambulance and rescue squad," TransCare does not have immunity under this provision (regardless of whether its "members" or employees have immunity). Either construction of the phrase is grammatically correct; in light of this ambiguity in meaning, we resort to the statute's legislative history to discern its purpose.

*Id.* at 235-36, 64 A.3d at 893 (emphasis added). The two phrases of "fire company" and "rescue company" only become ambiguous when modified by the adjective "volunteer."

This is particularly significant because of the second reason Respondents' position fails. *TransCare* addresses the interpretation of Cts. & Jud. Proc. § 5-603(b)(3), which states that "[a] **volunteer fire department or ambulance and rescue squad** whose members have immunity . . ." are "not civilly liable for any act or omission in giving any assistance or medical care[.]" (Emphasis added); *see also* Cts. & Jud. Proc. § 5-603(a). Conversely, Petitioners in the present case are claiming immunity from suit under § 5-604(a), which states that "except for any willful or grossly negligent act, **a fire company**

- 21 -

**or rescue company**, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties." (Emphasis added). The language in § 5-604(a) clearly differs from the language in § 5-603(b)(3) because the former section omits the word "volunteer" from its language of which entities are afforded immunity. Section 5-603(b)(3) is only ambiguous because of its use of "volunteer" as a modifier, and because that language does not appear in § 5-604(a), *TransCare* does not render § 5-604(a) ambiguous and is not binding on the present case.

We decline to revisit our opinion in *Chase* to conclude that § 5-604(a) is ambiguous and intended to only confer immunity upon private and volunteer fire and rescue companies, as Respondents request. *TransCare* does not alter our interpretation of § 5-604(a) in *Chase*, and Respondents offer no compelling reason for us to revisit our *Chase* opinion. Accordingly, we conclude that § 5-604(a) unambiguously applies to municipal fire departments, and immunizes them and their employees from simple negligence claims.

## CONCLUSION

We conclude that there was not sufficient evidence to establish that Petitioners committed gross negligence. The mere fact that Petitioners inaccurately diagnosed and treated their patient does not elevate their conduct to gross negligence. "[W]e cannot equate a well-intended error in medical judgment – even if it costs the patient's life – with wanton and reckless disregard for the life of that patient." *McCoy v. Hatmaker*, 135 Md. App. 693, 713, 763 A.2d 1233, 1244 (2000). Petitioners assessed the patient, took his vitals, and promptly transported him to the nearest hospital within approximately seven

- 22 -

minutes of first arriving on the scene.  Based on the evidence presented at trial, the jury

could not have found that Petitioners were grossly negligent by a preponderance of the

evidence.  We further conclude that Cts. & Jud. Proc. § 5-604(a) unambiguously confers

immunity upon municipal fire departments in simple negligence claims.  *See Mayor & City*

*of Baltimore v. Chase*, 360 Md. 121, 756 A.2d 987 (2000).  Accordingly, we reverse the

judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. COSTS TO BE PAID BY RESPONDENTS.**

Circuit Court for Baltimore City
Case No. 24-C-14-001249
Argued: June 7, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 64
September Term, 2018

_____

JOSEPH STRACKE, *et al.*

vs.

ESTATE OF KERRY BUTLER, JR., et *al.*

_____

Barbera, C.J.
*Greene
McDonald
Hotten
Getty
Booth
Wilner, Alan M. (Retired, Specially
Assigned)

_____

Dissenting Opinion by Wilner, J., which Barbera,
C.J., and McDonald, J., join

_____

Filed: August 16, 2019

*Greene, J., now retired, participated in the
hearing and conference of this case while an
active member of the Court; after being recalled
pursuant to Maryland Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this Opinion.

The Court today holds, as a matter of *law*, that what a jury necessarily found was **a** knowing, conscious, deliberate violation by two paramedics, responding to a Priority 1 emergency 911 call, of what was reported to be and actually was, a heart attack, of virtually every protocol adopted both by the State agency authorized by law to promulgate such protocols and their own municipal employer, and which led directly to the death of the patient does not constitute gross negligence. With respect, I dissent. In my view, the Court has given lip service to, but has effectively departed from, this Court's jurisprudence in **several** important respects. Although it denies doing so, it treats as facts assertions that the jury obviously did not accept, which is inappropriate when reviewing a judgment N.O.V., and it does not give full credence to recent pronouncements of this Court regarding the nature of gross negligence.

The procedural history of this case is set forth in the Majority Opinion and need not be repeated. What is not so clear from the Majority Opinion is the critical fact that two diametrically contradictory versions of what actually occurred were presented to the jury. The conflict was so dramatic and pervasive that the jury could not rationally conflate the two versions. It had to believe one or the other, and, on proper instructions from the court, it obviously chose to believe the version presented by the plaintiffs. Had it chosen to accept the version presented by the defendants, it would have had no choice but to find no negligence at all on their part – they would have done nothing wrong. To illustrate that point, the reader needs to understand in greater detail what the jury had before it.

FACTUAL BACKGROUND

1

Mr. Butler's wife Crystal described her husband, who was 28 years old, as "stocky" but healthy, able to engage in normal physical activities, with no history of heart problems. In fact, Mr. Butler was not in good health. The autopsy report showed that he was obese (five foot-seven inches tall weighing 244 pounds) and had a "50% stenosis of the left anterior descending coronary artery with near complete occlusion by superimposed thrombus [and] 70% stenosis of the right coronary artery with near complete occlusion by superimposed thrombus." He died of "coronary artery thrombosis due to atherosclerotic cardiovascular disease." His illness was apparently asymptomatic until March 1, 2011, but he clearly had a significant heart problem.

Petitioners Stracke and Cisneros were employed by the Baltimore City Fire Department. Mr. Stracke was certified as an "emergency medical technician basic (EMTB); Ms. Cisneros was a trained and nationally certified paramedic and an advanced life support medic. Both acknowledged that they had been trained in and were familiar with the Maryland Medical Protocols for Emergency Medical Services Providers adopted by the Maryland Institute for Emergency Medical Services Systems (MIEMSS) and comparable EMS procedures adopted by the Baltimore City Fire Department that governed their responsibilities when responding to medical emergencies.[1]

---

[1] MIEMSS is an independent State agency created by Md. Code, § 13-503 of the Education Article. Among its duties is the adoption of an Emergency Medical System Plan that would include "criteria and guidelines for the delivery of emergency medical services including provisions to assure proper medical direction of emergency medical services." § 13-509.

2

**The Call**

Mr. and Ms. Butler were both out on the evening of March 1, 2011. Mr. Butler was visiting his brother; Ms. Butler was visiting her mother. When she returned around 10:00, Mr. Butler already was home and said he was hungry, so she gave him a "spicy chicken sandwich meal" she had gotten from Wendy's, a fast-food restaurant. She then went to bed. Her husband watched television for a while and ate the sandwich, along with some cookies. Some four hours later, just before 1:00 a.m., Mr. Butler woke her, told her he was having a heart attack, and asked her to call 911. He was lying on the bed with his legs "balled up." His teeth were clenched, he was mumbling, and he had his hands on his chest.

Ms. Butler immediately called 911. The call came in at 1:02 a.m. Ms. Butler reported that her husband said he was having chest pains, was breathing "kinda fast," and was having difficulty speaking. She reported that he had not taken any drugs or medications and had not previously had a heart attack or angina. She made no mention of Mr. Butler complaining of indigestion or heartburn. In light of that information, the Fire Department regarded this as a Priority 1 chest pain case.

Within two minutes, Medic 5 unit, consisting of Mr. Stracke and Ms. Cisneros, was dispatched. They were informed that the problem was "chest pains 28 year old male." Under the Baltimore City Fire Department procedures, all 911 calls requiring emergency medical service are categorized initially as Priority 1 calls. Quite apart from that, an assessment indicative of a heart attack or congestive heart failure of itself would be a Priority 1.

3

Unfortunately, the dispatcher gave the unit an incorrect address – 850 Bethune Court instead of 860. That caused only a relatively short delay, however; photographs placed in evidence show that the buildings were townhomes located adjacent to one another. The unit arrived on scene at the Butler home at 1:19 a.m.

In the meanwhile, because Mr. Butler was unable to dress himself, his wife assisted him, and because he was unable to walk by himself, she also helped him move from the upstairs bedroom to the front door. She was standing at the front door when the ambulance arrived. Mr. Butler remained seated inside near the door.

### The Immediate Response

Ms. Butler saw the driver – Mr. Stracke – exit the ambulance several houses away and called to him. His response, according to her, was "[v]ery loudly he said what seems to be the problem." The tone of his voice was "Very angry. Very loud." She replied "he say [*sic*] he's having a heart attack." Mr. Stracke did not enter the house and, because it was dark, could see only that Mr. Butler was seated. From the outside, he loudly asked Mr. Butler what the problem was. His exact words, according to him, were "what's going on my main man?" Mr. Butler was unable to respond. According to Ms. Butler, he was mumbling, which he did not ordinarily do, and so she spoke for him. She told Mr. Stracke that her husband "could barely walk and he could barely talk." Mr. Butler was still holding his chest and was bent forward.

The ambulance was parked 30 to 40 feet away from the house. Notwithstanding Ms. Butler's statement that her husband could barely walk, Mr. Stracke responded that he

4

was "going to have to walk." Ms. Butler repeated that he couldn't walk, but Mr. Stracke told Mr. Butler again, "you're going to have to walk." Although there was a stretcher in the ambulance, Mr. Stracke refused to get it and forced Mr. Butler to walk to the ambulance as a condition of being taken to the hospital. Ms. Butler stated explicitly that her husband never volunteered to walk to the ambulance. At no time prior to forcing Mr. Butler to walk to the ambulance did Mr. Stracke conduct any kind of physical examination of Mr. Butler, take his blood pressure or other vital signs, administer oxygen, or offer him aspirin or any other medication that he was authorized to offer. Nor did Ms. Cisneros, who was the more highly trained of the two, offer any assistance at that point or intervene in any way. She remained at the ambulance.

In light of Mr. Stracke's insistence, Mr. Butler was forced to walk – in Ms. Butler's words, "stumbling" and "staggering" – the 30 to 40 feet to the ambulance, with his hands still on his chest, without any assistance from either Mr. Stracke or Ms. Cisneros. Having reached the ambulance, he then was forced to hoist himself or climb some steps in order to enter the ambulance, again without any assistance from Mr. Stracke or Ms. Cisneros, who were engaged in a conversation at the time.[2]

Mr. Stracke told a very different story. He acknowledged that, under the MIEMSS protocols, a report of chest pain was Priority 1. Nonetheless, because it was late at night, he did not activate the siren or lights on the ambulance on the trip to the scene. In contrast

---

[2] The testimony of Mr. Stracke and Ms. Cisneros is somewhat ambiguous in how Mr. Butler entered the ambulance. Mr. Stracke said "[h]e pulled his-self up" without assistance. Ms. Cisneros indicated that there were steps that Mr. Butler had to climb.

to Ms. Butler's testimony, Mr. Stracke said that, when he first encountered Mr. Butler, Mr. Butler looked "normal," he was not holding his chest, and he did not appear to be in any pain. As noted, his greeting to Mr. Butler was "what's going on my main man." Mr. Butler's only response was that his right side hurt. He said nothing about having heartburn. Mr. Stracke said that he told Mr. Butler to "hold tight" while he got a stretcher but that Mr. Butler responded that he was "ready to go" and walked out of the house on his own accord.

Mr. Stracke insisted that Mr. Butler had no difficulty walking – he was "a healthy male walking." Mr. Stracke made no inquiry of Mr. Butler regarding the pain in his right side or about any medicines he had taken. Mr. Stracke acknowledged that MIEMSS protocols required that he enter the house to ascertain the nature of the problem and that he provide a stretcher to transport the patient, and that he failed to do either. Indeed, he testified that he offered to get a stretcher and Mr. Butler declined. The gist of his testimony was that compliance with the protocols was somewhat discretionary. Ms. Cisneros regarded them as "the Bible" and that compliance is required "because it's a serious situation. You're taking care of people's lives" but agreed with Mr. Stracke that a stretcher was not required if she determined that it was not necessary.

Ms. Cisneros said that, when Mr. Stracke located the proper address, she went to the rear of the ambulance to retrieve a stretcher and a bottle of oxygen, as the applicable protocols required, but terminated that effort when she saw Mr. Stracke wave to her and say that Mr. Butler would be walking. She never approached the home and first saw Mr.

6

Butler when he was midway to the ambulance.[3] She confirmed Mr. Stracke's statement that Mr. Butler was not stumbling or leaning and that his steps were "perfectly normal." She said that Mr. Butler had his hand on his throat, which he said was burning and that he denied that he was having chest pains. During the trip to the hospital, she took some of his vital signs, which she said were normal. She said that Mr. Stracke took his blood pressure and that she felt his pulse, checked his pupils, listened to his lungs, and looked at his skin. She added that Mr. Butler was "very chatty."

From all of that, having learned that Mr. Butler had consumed spicy chicken, and being unable to reproduce any pain on his right side, Ms. Cisneros concluded that she "had no reason to believe that the patient was in anything other than stable [ ] condition," and, accordingly, downgraded him from Priority 1 to Priority 3 and, in her EMS Patient Care Report, recorded the problem as "chest heartburn," breath "non-labored," and "patient condition "stable."

### Events at the Hospital

According to Ms. Cisneros' report, she and Mr. Stracke spent only four minutes with Mr. Butler at his home. The trip to the hospital took about four minutes. In the ambulance, Mr. Butler was seated on a bench rather than placed on the available stretcher.

---

[3] The Majority Opinion states that "Cisneros promptly exited the ambulance with a medical bag and oxygen bottle in order to fully and properly assess Mr. Butler's condition," but neglects to add that, when Stracke told her that Mr. Butler would be walking, she returned the bag and apparently never opened it.

7

Upon arrival at the hospital, he was required to remove himself from the ambulance without assistance but was taken to the emergency room in a wheelchair.

Ms. Butler followed the ambulance in a separate car and said that she arrived at the emergency room before her husband and waited there until he arrived. She registered him. A hospital employee who identified himself as a multi-functional technician (MFT) said that he first noticed Mr. Butler standing outside the hospital for five to ten minutes before he was wheeled into the emergency room. The MFT said that one of the paramedics – either Mr. Stracke or Ms. Cisneros – was with Mr. Butler. The other appeared to be giving the charge nurse a report.[4]

The MFT noticed him again about five or ten minutes later, after he had been wheeled into the emergency room. He was sitting in a wheelchair with his hands on his chest, complaining that his chest hurt. One of the paramedics was with him but made no effort to assist him. Some five to ten minutes after that, the MFT saw Mr. Butler for a third time. He was still in the wheelchair in the same spot. He was "hollering for help" and again complaining that his chest hurt. At that point, he was alone.[5]

---

[4] Here, again, the Majority ignores evidence that the jury may have found significant. The Majority Opinion states that "Stracke *immediately* retrieved a wheelchair for Mr. Butler." (Emphasis added). The MFT testified that he saw Mr. Butler *standing* outside the hospital for five to ten minutes before being wheeled into the emergency room.

[5] There is some ambiguity in the MFT's testimony regarding how many times he saw Mr. Butler and what was happening. On direct examination, he was clear that he noticed Mr. Butler on three occasions, once before he was wheeled into the emergency room and twice afterward. On cross-examination, what he saw on the second and third occasions seems to be conflated. He was clear that on the last occasion, Mr. Butler was hollering, had his

8

Mr. Stracke stated that, when they arrived at the hospital, Mr. Butler exited the ambulance on his own without asking for any assistance, and that Stracke then got the wheelchair and wheeled him into the hospital. We may infer (or the jury could) that the MFT's first observation of Mr. Butler occurred while he was waiting for Mr. Stracke to bring the wheel chair. Neither he nor Ms. Cisneros retrieved any of the emergency medical equipment in the ambulance. Ms. Cisneros went directly to the nurse's station, and Mr. Stracke remained with Mr. Butler, standing behind him.

At some point, while Mr. Stracke was standing behind Mr. Butler, Mr. Butler's head lurched back and hit Mr. Stracke's stomach, which caused Mr. Stracke to inquire "What are you sleepy, main man?" Ms. Cisneros, who had a better view, proclaimed that he was having a seizure, as she observed him sliding out of the wheelchair. Fortuitously, a doctor appeared on the scene, and Mr. Butler was wheeled into an adjacent Code Room and placed on a table.

Dr. Alan Barnes, who was on duty at the time, examined Mr. Butler in the Code Room. The chart prepared by Ms. Cisneros indicated chest or abdominal discomfort, but Mr. Butler was unresponsive and had no pulse. Dr. Barnes, with hospital staff assistance, commenced advanced cardiac life support measures and tried to find out what had happened. All he could learn from Ms. Cisneros was that the patient "was complaining of

---

hands on his chest, and that no paramedics were with him, but it wasn't entirely clear whether that was the second or third occasion. It appears that any confusion in this regard emanates from the fact that the cross-examination focused on what the MFT saw and heard **after** Mr. Butler was in the emergency room.

9

some discomfort which occurred after he had eaten, like, a spicy chicken sandwich." Indeed, that is what Ms. Cisneros reported to the hospital staff. The Emergency Nursing Record shows the Chief Complaint as "Pt brought in by EMS c/c 'heartburn eating spicy chicken.'"

Dr. Barnes noted that, although Ms. Cisneros had told him that Mr. Butler had eaten the spicy chicken "a relatively short period of time before this incident occurred" Ms. Butler had said that her husband had eaten the chicken "hours before" and that "there possibly was no relation between eating of this spicy chicken with this episode that occurred." Ms. Butler told Dr. Barnes what she said she had told Mr. Stracke – that her husband was having chest pains and she was concerned that "something was seriously wrong with him." The resuscitation efforts, which continued for about an hour, were unsuccessful, and Mr. Butler was declared dead at 2:41 a.m. By then, both Mr. Stracke and Ms. Cisneros had left the hospital.

Dr. Barnes believed that Ms. Cisneros had misled the hospital regarding Mr. Butler's condition. Based on what he saw and what Ms. Butler told him, Dr. Barnes believed that Mr. Butler was not stable and obviously had a cardiac problem. Dr. Barnes stated that the paramedics had a duty to inform the hospital of that while they were enroute and to convey him to the emergency room in a gurney rather than a wheelchair. They gave no such notice, brought him in a wheelchair, and informed the hospital staff that he did not have a cardiac problem. That is why the hospital staff did not deal immediately with the

10

patient but allowed him to sit in the emergency room for ten minutes or more until he collapsed and likely why no cause of death could be determined until the autopsy.

**The MIEMSS and Fire Department Protocols**

Respondents' claim of gross negligence is based largely on petitioners' alleged violation of the Medical Protocols for Emergency Medical Service Providers adopted by MIEMSS and comparable procedures adopted by the City Fire Department. Relevant are the protocols in place in 2011, when the incident at issue here occurred.

The purpose of the MIEMSS protocols, as explained in the General Provisions section was "to standardize the emergency patient care that EMS providers, through medical consultation, delivered at the scene of illness or injury and while transporting the patient to the closest appropriate hospital." The protocols are declared to be "a form of 'standing orders' for emergency patient care intervention in a patient who has a life-threatening illness or injury." John Blake, the captain of EMS training for the City Fire Department, explained that "standing order" means that the provider, depending on the level of care, can perform those functions with or without consulting a physician.[6] He acknowledged that EMS personnel do not make medical diagnoses – only a physician may do that – but merely make an assessment of the patient's condition.[7]

---

[6] Mr. Blake explained that certain medications may not be administered without consent by a physician.

[7] Dr. Kevin Brown, one of the plaintiffs' medical experts, agreed that only a physician may enter a diagnosis in a patient's medical record but stated that assessments required to be made by EMTs also are in the nature of a diagnosis. In stating flatly that "[n]either Stracke

11

Mr. Blake testified that there are three priority levels under the protocols. Priority 1 is the highest life threat. The patient is critically unstable, needs to get to the hospital, and needs life-saving interventions as soon as possible.

The protocols for general patient care of a responsive patient require that the EMS provider obtain a history of the episode, take baseline vital signs, and perform a specified physical examination, none of which was done before requiring Mr. Butler to walk to the ambulance. A MIEMSS protocol defines an acute coronary syndrome as patients presenting with chest, epigastric, arm, or jaw pain or discomfort and may be associated with diaphoresis, nauseas, shortness of breath or difficulty breathing. Mr. Blake agreed that, in determining whether that condition exists, medics need to look for chest pain, clenching the chest, shortness of breath, sweating, trouble speaking – all of the signs Ms. Butler testified were present. Those symptoms, he said, should be treated as a coronary issue until that can be ruled out with a different assessment.

In order to rule out a cardiac event, Mr. Blake said that the paramedic would hook the patient up to a cardiac monitor (EKG), initially with four leads, and, if there's a "chief complaint," the protocol is to expand that to a 12-lead EKG, the latter of which could be

nor Cisneros are responsible for diagnosing medical conditions," the Majority ignores this evidence. MIEMSS protocols and expert medical testimony that the Majority also ignores make abundantly clear that, when certain symptoms are observed, EMTs must treat the problem as though it is a heart attack until such time as that can be ruled out.

done in the ambulance.[8]  Neither the four-lead nor the 12-lead EKG was done.  Dr. Kevin Brown, a medical expert who testified for the plaintiffs, confirmed that requirement.

Mr. Blake testified that, under the MIEMSS and Fire Department protocols, it would be inappropriate to make the patient walk to the ambulance if the patient did not wish to walk or if the patient's complaints were consistent with a possible heart attack.  Indeed, he said that moving the patient in a stretcher was "required" unless it was impossible to get the stretcher to the patient.  It would not be appropriate even to **allow** a patient with symptoms consistent with acute coronary syndrome to walk, whether by demand or by decision of the patient. In that situation, the patient should be ordered to stop and wait for a stretcher.  He stated that, although there was no MIEMSS protocol dealing with the patient lifting himself into the ambulance, in the paramedic training class, medics are taught that "any sort of strenuous activity is going to cause increased oxygen demand on the heart" which "could cause further damage to the heart, potentially."

MIEMSS protocols make clear that all Priority 1 patients require on-line medical consultation.  The City Fire Department protocols state, in the section dealing with hospital consultation, that, when providing consultation, "information is needed so that the physician may get a full picture of your patient's status," including "[a]ll pertinent information, i.e. vital signs, patient history, injury/illness to patient, and treatment rendered."  The City protocols also provide that "[p]atient care does not end when the medic unit arrives at the hospital receiving bay.  Care must be continued into the

---

[8] The MIEMSS protocols refer to an EKG as an ECG.

13

Emergency Department and until such care has been turned over to the emergency department staff." The evidence showed that no care at all was given to Mr. Butler by either Mr. Stracke or Ms. Cisneros while he languished in the emergency room in obvious pain and eventually hollering for help until he slid out of his wheelchair.

## Evaluation of the Evidence

As is evident, the jury was faced with two very different versions of what Mr. Stracke and Ms. Cisneros were told, what they observed, and what they did with that information. If Ms. Butler's version is believed, they were told repeatedly and were able to observe on their own that Mr. Butler was suffering from chest pains, not a sore throat, that he was unable to walk or talk in a normal way, that he had trouble breathing, that he was bent over holding his chest, and that he never volunteered to walk to the ambulance, much less to hoist himself into it, all of which indicates that he was having a heart attack. All of that evidence is internally consistent. None of it is mere conjecture, speculation, or hypothesis. The only question for the jury was whether it was credible.

The evidence presented by Mr. Stracke and Ms. Cisneros is completely opposite. They claimed that Mr. Butler was never holding his chest, that he could walk and talk normally, that he actually denied having any chest pains, that he had no trouble breathing, that he volunteered to walk to the ambulance, and that, until his sudden "seizure" at the hospital, there was no basis for any concern. He was simply suffering from having eaten spicy chicken that disagreed with him. That is what led Ms. Cisneros to downgrade the

14

situation from Priority 1 to Priority 3, for her and Mr. Stracke to conform their behavior accordingly, and for Ms. Cisneros to report that to the hospital staff.

The last part of the relevant evidence regarding the issue of negligence came from the plaintiffs' medical experts, Dr. Kevin Brown and Dr. Timothy Sanborn, who based their opinions on Ms. Butler's version as complemented by what actually occurred.

Dr. Brown opined that Mr. Stracke and Ms. Cisneros deviated from the standards of care, derived from the MIEMSS and Fire Department protocols, in several respects. The first deviation was the failure to make an assessment of Mr. Butler upon their arrival at his home. The call indicated a chest pain case, which required them to bring the EKG and defibrillator to the residence and determine whether the EKG was abnormal, and, if it was, to transport him in a manner that would lessen the physical demands on his heart. Dr. Brown said that, in light of the chest pain and other symptoms, Mr. Butler likely was experiencing an acute heart attack at that point and that, if an EKG had been taken, it would have been abnormal. That required rolling him to the ambulance, administering appropriate medication, and inserting a catheter into a vein, none of which was done. It is important, he said, to apply an EKG if the patient complains of chest pain. It takes no more than two minutes and has no downside.

The subsequent deviations followed from the first – requiring Mr. Butler to walk to the ambulance and hoist himself or climb steps in order to get in, the failure to inform the hospital that they had a patient with chest pains on the way, failure to put Mr. Butler on a stretcher and monitor his heart rhythm while he was in the emergency room waiting to be

15

triaged and to falsely inform the hospital in their Report that the problem was merely throat pain from having eaten spicy chicken a half-hour earlier.

Dr. Sanborn's testimony was through a pretrial video-taped deposition. He iterated the symptoms of a heart attack noted in the MIEMSS and Fire Department protocols, including pain in the throat and right side and trouble breathing. He noted that patients sometimes complain of heartburn, believing that the pain is coming from the stomach, but an EKG can show that the pain is actually coming from the heart.

Dr. Sanborn confirmed that, when assessing a patient complaining of chest pain, the first thing is to "immediately" take vital signs, including blood pressure, administer oxygen, and provide aspirin. He confirmed as well that, given the symptoms described by Ms. Butler, Mr. Butler should have been placed on a stretcher and not allowed to walk to the ambulance. He added that "having them walk 40 feet and climbing into a medic unit is "complete disregard for common treatment of heart attack patients." That, he said, "can cause a heart attack or a cardiac event to become worse." In summary, he said:

> "No assessment was made of the patient in the dwelling. No treatment was given in the dwelling. No EKG was given in the dwelling. No vitals were performed until after the patient had got into the medic unit. And the patient was not placed on a wheeled stretcher. These are all deviations from the published documents, protocols."

None of that medical expert opinion is even mentioned in the Majority Opinion, but the jury heard it and presumably gave it credit.

As I have observed, there was no way that the jury could accept both versions or even some conflation of the two. Given the stark inconsistencies, it had to believe one or

16

the other. The Majority Opinion recognizes that, in reviewing the grant of a judgment N.O.V., we must view the evidence and the permissible inferences from the evidence in a light most favorable to the non-moving party – in this case the plaintiffs. "If the non-moving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the judgment notwithstanding the verdict should be denied." *Sage Title Group, LLC v. Roman*, 455 Md. 188, 201 (2017), quoting from *Cooper v. Rodriguez,* 443 Md. 680,707 (2015).

What that means, and what I perceive the Majority has missed, is that the only evidence that we may consider in judging the validity of the judgment N.O.V. is what Ms. Butler, the hospital MFT, Dr. Barnes, Drs. Brown and Sanborn, and Mr. Blake said and not any contradictory evidence from petitioners. The Majority, in my view, is simply incorrect in considering as a basis for its conclusion that "[i]t was not until Butler, Jr. had been waiting in the hospital for an additional ten minutes did his symptoms begin to worsen and he eventually went into cardiac arrest" and that "[t[here was no evidence submitted at trial or reflected in the record that contradicts these facts." There was, indeed, such evidence – plenty of it – which the defendants ignored, the Majority has taken little or no account of, but the jury must have believed.

DISCUSSION

We granted cross-petitions for *certiorari* to consider three issues:

(1) Was there sufficient evidence of gross negligence on the part of Mr. Stracke and Ms. Cisneros;

17

(2) If so, was it the kind of gross negligence that provides immunity to them under CJP § 5-604(a); and

(3) Whether § 5-604(a) provides limited immunity to Mr. Stracke and Ms. Cisneros for simple negligence.

Because of its conclusion that there was insufficient evidence of gross negligence, the Majority understandably has declined to address the second issue. It addresses the third – whether to overrule *Baltimore v. Chase*, 360 Md. 121 (2000) – and correctly declines to do so. Because I believe that there was sufficient evidence of gross negligence, I think it appropriate to express my views on the second issue, which surely will arise again, and add some thoughts supporting the Majority's decision regarding *Chase*.

## Gross Negligence

Gross negligence is a concept well-ingrained in both our statutory and common law. The problem always has been in distinguishing it from ordinary negligence in the context of specific circumstances. As far back as *State, Use of Abell v. W. Md. R.R. Co.*, 63 Md. 433 (1885) (*Abell*), the Court recognized that "[t]here were degrees of negligence in the sense that some acts evidence a greater degree of carelessness and recklessness than do other acts which may still be classed as negligent [b]ut the difference between gross and ordinary negligence *is more a question of fact than of law*." *Id*. at 444 (emphasis added).

In *Barbre v. Pope*, 402 Md. 157, 187 (2007), citing *Abell*, we observed that "[i]ssues involving gross negligence are often more troublesome than those involving malice because a fine line exists between allegations of negligence and gross negligence."

18

Attempts have been made to define the distinction conceptually, but, not to denigrate the importance of that distinction, from a juror's perspective, it seems to partake more of Justice Potter Stewart's observation in *Jacobellis v. Ohio*, 378 U.S. 184 (1964) – an obscenity case – that you know it when you see it.

As did the trial court, the Majority relies on a definition of gross negligence stated in *Tatum v. Gigliotti*, 80 Md. App. 559, 568 (1989), which was taken from *Foor v. Juvenile Services*, 78 Md. App. 151, 170 (1989). It stresses "wanton or reckless disregard for human life or for the rights of others." This Court has restated that concept more recently but in somewhat different language and with an added caveat based on *Abell* and *Barbre*. In *Beall v. Holloway-Johnson*, 446 Md. 48. 64 (2016), quoting from *Barbre*, we said:

> "Gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."

*See* also *Cooper v. Rodriguez*, 443 Md. 680, 708 (2015).[9]

We confirmed in *Beall,* at 64, what our predecessors noted in *Abell* 134 years ago, that "[t]he distinction between negligence and gross negligence, however, can be a difficult

---

[9] In *State v. Thomas,* ___ Md. ____ (2019) (No. 33, Sept. Term 2018, Opinion filed 6/24/19) the Court defined "gross negligence" in its context as an element of voluntary manslaughter. It is not substantively different from what we said in *Barbre*, *Beall*, and *Cooper*, but our pronouncements in those cases are more apposite, as they dealt with the meaning of the term in the context of a civil action for damages.

19

one to establish in practice" and that "[a] legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross."

The Majority views *Barbre*, *Cooper*, and *Abell*, as having "morphed the distinctions between simple and gross negligence by holding that 'a legally sufficient case of ordinary negligence frequently be enough to create a jury question of whether such negligence was or was not gross.'" Those cases did not "morph" those distinctions. I note, as a matter of passing interest, that all three were unanimous Opinions of the Court; there were no dissents or concurring Opinions. The Court obviously meant what it said. They articulated the theoretical difference between ordinary and gross negligence but pointed out quite clearly that ascertaining which side of the line the facts fall on is often a factual one for the trier of fact, with proper instructions in a jury case, to resolve. If anything, concentrating on wantonness and inflicting injury intentionally tends to conflate gross negligence with malice, which also contains elements of "intent to injure" and "knowing and deliberate wrongdoing." *See Newell v. Runnels*, 407 Md. 578, 636 (2009).

If any clarification of what was said in *Barbre* and *Beall* would be helpful, it ought to be just the first part of what was said in those cases – that the test for gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them" – and to

20

consider wanton and deliberate wrongdoing as satisfying that test but not independent elements of it.

What elevates this to gross negligence? What shows a reckless disregard by Stracke and Cisneros of the consequences of their conduct or utter indifference to the rights of Mr. Butler? As a centerpiece, the jury was entitled to consider (and the trial court, in ruling on the motion for judgment N.O.V., was required to consider) what was at stake – the nature of the harm that petitioners, given their training, knew may arise from a failure to perform their duties properly, discounted or multiplied, as the case may be, by the likelihood that such harm actually may ensue.

There was no dispute in this case that petitioners were well aware of the MIEMSS and Fire Department protocols applicable to potential cardiac patients and they also were well aware of the potential consequences of a failure to comply with those protocols. Those protocols were in the nature of standing orders, not just helpful guidelines. It may be, as the Majority states, that some of those protocols are administrative in nature or deal with matters not relevant to this case, but the ones at issue here, dealing with what is required when confronted by the symptoms of a heart attack, are precise and mandated, and were confirmed by expert medical testimony that the Majority also has ignored. Ms. Cisneros acknowledged that compliance was required "because it's a serious situation. You're taking care of people's lives." There also was no dispute, given the facts that we must assume when evaluating a judgment N.O.V., that petitioners failed to comply with nearly

21

every protocol applicable to potential cardiac patients – at the scene, in the ambulance, and at the hospital.

Given those facts, it clearly was a jury issue as to whether, after being consistently told by Ms. Butler that her husband was having a heart attack, that he was unable to walk, talk, or breathe properly, that he was in pain and was holding his chest, and seeing for themselves that that, indeed, was the case, (1) forcing him to walk to the ambulance and get himself inside it without having made the required assessment, (2) downgrading his condition to Priority 3 and acting accordingly, (3) informing the hospital that the only problem was indigestion, and rendering no assistance to him at all while he waited in the emergency room in pain and hollering for help constituted a reckless indifference to or disregard for Mr. Butler's rights. All of this is different in kind from merely making an incorrect diagnosis or negligence in implementing a medical procedure, which is how petitioners and the Majority view it.

Faced with information that, on its face, demonstrated the strong likelihood that Mr. Butler was having a heart attack and the awareness by petitioners of the procedures required by the MIEMSS and Fire Department protocols, the negligence here was not only ignoring that information but (1) refusing to confirm or dismiss it by testing it in accordance with required protocols, which would have informed them that their impression was incorrect, (2) deliberate conduct that, if Mr. Butler was indeed having a heart attack, was likely to exacerbate the problem and may kill him, and (3) affirmatively misleading the hospital staff as to the nature of the problem, which led to his lingering in the emergency

22

room, low on the triage agenda. Harking to the point made in *Beall* that a legally sufficient case of ordinary negligence will frequently be enough to create a jury question whether the negligence was or was not gross, the jury's finding of gross negligence in this case was well-supported by the evidence taken in a light most favorable to the plaintiffs.[10]

Finally, I think it important to address the Majority's concern about the "practical implications" of regarding the inexcusable violations found by the jury as gross negligence – the "negative impact" and "chilling effect" on first responders. That concern is misplaced. For one thing, I am not aware of any other case in Maryland in which EMTs acted with such utter disregard of a patient's life and health as the jury found the defendants did in this case; none have been cited by the Majority. First responders are well-protected by CJP § 5-604(a), even if they are negligent.

To the extent that practical implications should have any bearing on how this Court views the evidence in this case, my concern is with the practical implications to the individuals the EMTs are duty-bound to help when responding to a 911 call for emergency assistance if they feel secure in the knowledge that there is no consequence to them for ignoring the whole raft of MIEMSS protocols specifically designed to assure that those in

---

[10] If what the defendants did and failed to do does not rise to gross negligence, what would? Would it be gross negligence if Mr. Stracke had required Mr. Butler to do 20 pushups in order to demonstrate to Mr. Stracke's satisfaction that he was, in fact having a heart problem and needed a stretcher? Where to draw the line, and more important, whose function is it to draw that line – the jury who heard and saw the witnesses and could judge their credibility or this Court as a matter of law on a cold record?

23

need of that assistance get it. The applicable principle here is *primum non nocere* (a loose translation from the Hippocratic Oath: FIRST, DO NO HARM).

## IMMUNITY

As noted, two statutory construction issues regarding CJP § 5-604(a) were raised. In light of its conclusion that there was no gross negligence, the Majority has understandably declined to address one of them; and it has very briefly rejected the other. I think it useful to explore those issues; one will clearly arise again, and the other deserves a fuller explanation. A dissent, of course, is not a decision of the Court, but it may help inform the debate if and when the issue arises again.

Section 5-604(a) provides that, notwithstanding any other provision of law, "except for any willful or grossly negligent **act**, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any **act or omission** in the course of performing their duties" (emphasis added).[11] Two questions are raised: first, does subsection apply to employees of the City Fire Department in the rendering of medical care; and second, if so, what kind of gross negligence is necessary to preclude immunity?

---

[11] Subsection (b) provides for a waiver of that immunity with respect to actions to recover damages for the negligent operation of a motor vehicle. That subsection does not apply in this case, as there was no allegation that petitioners were negligent in the operation of their ambulance.

24

**Application Of § 5-604(a) To Municipal Employees Who Render Medical Care**

The first issue was raised by respondents in their cross-petition. They contend that § 5-604(a) was intended to provide immunity to municipal fire and rescue personnel for negligence in fire suppression and rescue services, not with respect to the provision of medical care. To hold otherwise, they claim, would create an inconsistency with the Good Samaritan Act (CJP § 5-603). They recognize that this Court held otherwise in *Baltimore v. Chase*, 360 Md. 121 (2000), but argue that *Chase* was wrongly decided and should be overruled.

This Court first looked at the history and scope of § 5-604(a) in *WSSC v. Riverdale Fire Co.*, 308 Md. 556 (1987), an action in which WSSC (the Washington Suburban Sanitary Commission) was sued for damages for negligence in maintaining its fire hydrants, which caused a delay in responding to a fire. WSSC filed a third-party complaint against Riverdale Fire Company, a volunteer fire department, for negligently connecting its hoses to fire hydrants that it knew were inoperable, and Riverdale claimed immunity under what is now § 5-604(a).

The fire occurred in 1980 – three years before the enactment of what is now § 5-604(a) – and the issue was raised of whether the statute was retroactive. In considering that issue, the Court looked at the history of the statute. It determined that the statute was in response to a decision of the Court of Special Appeals in *Utica Mut. v. Gaithers-Wash Grove Fire*, 53 Md. App. 589 (1983). That also was an action for damages against a volunteer fire company for negligent failure to extinguish a fire. The question was whether

25

the fire company enjoyed governmental immunity, and, based on its earlier decision in

*Macy v. Heverin*, 44 Md. App. 358 (1979), the appellate court held that it did not because there was insufficient evidence that the defendant was a governmental agency.

The legislative reaction to that decision was swift. The Legislature was then in session, and a bill was introduced within days to provide immunity. The first reader bill (SB 731) was expressly limited to volunteer fire companies. It provided that "[a] volunteer fire company is immune from liability in the same manner as a local government agency for any act or omission in the course of performing its duties if the act or omission is not one of gross negligence." [12]

The bill was completely rewritten in the Senate Judicial Proceedings Committee to detach the immunity from merely paralleling that then enjoyed by governmental units and instead to provide a separately-stated immunity for fire and rescue companies generally and their personnel (as well as to add immunity provisions dealing specifically with the operation of motor vehicles). This is reflected not only in the text of the bill, as enacted, but in the Judicial Proceedings Committee Hearing Summary and Committee Report and in the initial and revised fiscal notes.

---

[12] As initially drafted by the bill-drafting unit of the General Assembly, the bill contained three additional conditions to immunity for volunteer fire departments – that the company is receiving funds from a State, county, or municipal government; that one of those units of government owns buildings used by the company; and that the company is regulated by one of those units. Those additional provisions were not included in the bill as introduced.

26

In that Hearing Summary, the Committee described the purpose of the first reader bill as "[a] new law which provides that a volunteer fire company is immune from liability in the same manner as a local government for any act or omission in the course of performing its duties if the act or omission is not one of gross negligence" but pointed out that the Committee amendments struck those provisions and substituted immunity for a fire or rescue company – **any** fire or rescue company – "for any act or omission in the course of performing their duties except for any willful act."

This Court considered that history in *Baltimore v. Chase, supra*, 360 Md. 121 and more recently in *Transcare v. Murray*, 431 Md. 225 (2013), in which the Court held, among other things, that, absent special circumstances, the immunity provided in § 5-604 did not apply to a commercial ambulance company.

Like this case, *Chase* involved a medical employee of the Baltimore City Fire Department who responded to a 911 call and was sued for negligence and gross negligence in his treatment of the patient. The alleged negligence in *Chase* arose from the manner in which the EMT intubated the patient who had gone into cardiac arrest. The negligence was in the performance of an authorized medical procedure, not in the wholesale disregard of clearly applicable mandated procedures. The Circuit Court granted summary judgment to the defendants on the ground that there was no gross negligence and, as a result, the defendants had immunity under § 5-604(a). The Court of Special Appeals reversed, holding that § 5-604(a) applied only to volunteer and private fire and rescue companies and therefore was inapplicable to paramedics employed by a municipal fire department.

27

A majority of this Court disagreed with the Court of Special Appeals' conclusion and held that a plain reading of the statutory language indicated a legislative intent to cover municipal fire and rescue departments and their medical employees. The majority discussed and rejected the dissent's view that the legislative history of the statute showed a clear intent to do no more than give volunteer companies and their employees the same, but no greater, immunity then enjoyed by governmental agencies.

*Chase* was a four-to-three decision, and one can find merit in both positions. It is decided law, however, and has been for 19 years, and, like the Majority in this case, I find no compelling reason to revisit it. Section 5-604(a) does apply to municipal fire and rescue departments when providing emergency medical service, notwithstanding that some of them charge a fee for their services. If, as respondents claim, that construction creates an anomaly when compared with the provisions of the Good Samaritan Act (CJP § 5-603), which conditions immunity from medical mistakes, at least in part, on the service having been provided without a fee, that may be brought to the attention of the General Assembly.

**Acts and Omissions**

I have emphasized the words "act" and "act or omission" because they lie at the heart of this phase of petitioners' statutory construction argument. They regard any gross negligence on their part as sins of **omission** – the failure to make a proper assessment of Mr. Butler at his home, the failure to transport him to the ambulance on a stretcher, the failure to keep him on a stretcher while enroute to the hospital, the failure to inform the hospital emergency department of the patient's true condition, the failure to keep him on a

28

stretcher while in the emergency room at the hospital, and the failure to assist him in entering and exiting the ambulance. The only exception to immunity, however, as they read the statute, is a grossly negligent **act.** If the Legislature intended to preclude immunity for grossly negligent **omissions**, they argue, it would have said so.

Section 5-604(a) is not a model of clear legislative drafting. It first provides an exception to immunity for "any willful or grossly negligent **act**," but then expresses the immunity for "any **act or omission** in the course of performing their duties." (Emphasis added). Did the General Assembly really intend by that to provide immunity for willful or grossly negligent **omissions** but not for willful or grossly negligent **acts**? Other than the textual language and its repetition in the Judicial Proceedings Committee explanation, I can find nothing in the legislative history to explain the discrepancy.

There are many rules of statutory construction, some general, some specific. The so-called "cardinal" rule is "to ascertain and carry out the true intention of the Legislature." *Windesheim v. Larocca*, 443 Md. 312, 341 (2015); *Della Ratta v. Dyam* 414 Md. 556, 566 (2010). The more specific rules are in the nature of guidelines in how to achieve that objective. We start, and often finish, with the actual words of the statute. If there is no ambiguity – if it is clear what the Legislature intended – we normally go no further. *Windesheim*, at 341.

Occasionally, however, when we look at the overall purpose of the statute – what the Legislature was trying to achieve – the phrasing of the statute may not be quite so clear. *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 122 (2014). We have recognized that a term

29

may be free from ambiguity in one context but ambiguous or of doubtful application in another. *Nationsbank v. Stine*, 379 Md. 76, 85 (2003); *Gardner v. State*, 344 Md. 642, 648 (1007). "In every case," this Court has said, "the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Espina v. Jackson*, 442 Md. 311, 322 (2015); *Blackburn Ltd.* at 122. "An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of absurd or unreasonable reading, grounds the court's interpretation in reality." *Blue v. Prince George's Co.*, 434 Md. 681, 689 (2013).

It is certainly possible to read § 5-604(a) as it is written, namely to draw a distinction between **acts** of gross negligence and **omissions** that are grossly negligent and to provide immunity for the latter but not the former. It is difficult for me to see any reasonable basis for doing so, however, and the legislative history certainly does not supply one. There are laws that provide absolute immunity to certain categories of individuals, even for grossly negligent or malicious conduct – judges for judicial acts, legislators for legislative acts, prosecutors for prosecutorial acts, for example – but I am unaware of any that distinguish between grossly negligent (or malicious) acts and grossly negligent (or malicious) omissions, because often the conduct at issue partakes of both.

That is the case here. Petitioners view their conduct as purely sins of omission – omitting to make a required assessment of Mr. Butler at his home, omitting to use the stretcher to transport him, omitting to assist him in entering and exiting the ambulance, and omitting to correctly inform the hospital of his true condition, but they were more than that.

30

What may have killed him was forcing him to walk to the ambulance without conducting the required assessment, to hoist himself or climb steps to get in and out of the ambulance, of having to sit in the wheelchair at the hospital, of affirmatively misinforming the hospital of the real problem. Those are **acts**, not **omissions**.

In light of the clear overall intent by the General Assembly **not** to immunize willful or grossly negligent conduct, which is consistent with most immunity statutes, I would be reluctant to construe § 5-604(a) as indicating an intent to immunize willful or grossly negligence that embodies **both** acts and omissions, including when the **act** is associated with, generated by, or follows from a willful or grossly negligent **omission**. That would, indeed, be an absurd, illogical result that I do not believe the Legislature intended. There may be situations in which the conduct at issue is solely in the nature of an omission of some sort, unconnected with any affirmative act and the statute reasonably can be applied literally, but that is not the situation in this case.

For the reasons stated, I would affirm the judgment of the Court of Special Appeals.